[Civ. No. 9555. Second Appellate District, Division Two.—May 24, 1934.]

BEN EINZIG et al., Petitioners, v. THE BOARD OF POLICE COMMISSIONERS OF THE CITY OF LOS ANGELES et al., Respondents.

Guy Richards Crump and Roy W. Colegate for Petitioners.

Ray L. Chesebro, City Attorney, Ernest K. Maine, Deputy City Attorney, John L. Bland, Deputy City Prosecutor, and Bourke Jones for Respondents.

Newlin & Ashburn and Gurney E. Newlin, as *Amici Curiae* on Behalf of Respondents.

ARCHBALD, J., *pro tem.*—The sole question involved in this proceeding is: Did respondent board act in excess of its jurisdiction in revoking permits theretofore issued to petitioners authorizing them to conduct the game called "Tango" or "Skill Ball"? The authority of the board to revoke permits issued under the ordinance authorizing them is not questioned, "if said board becomes satisfied that the conduct of such games does not or will not comport with the public welfare for any reason, or that the same has been conducted in an illegal, improper or disorderly manner . . . [or] where the proprietor or person or persons in charge thereof violates or permits any infraction of . . . any law of the State of California, or any ordinance of the City of Los Angeles".

█ It is the contention of petitioners that there is no support in the evidence for the finding made by the board that the game is "in violation of section 319 and section 330 of the Penal Code". If there is no such support in the evidence the decision of the board is subject to review. Otherwise not.

The evidence shows that the game in question is one played by a group of persons. Before each game begins the attendant announces what the prize is to be, "whether it was two, three or four dollars in merchandise", and some announced that "the next game will be a five dollar game" or "a ten dollar game" or "a fifteen dollar game". Those desiring to participate would then seat themselves around a counter on the opposite side of which, about four feet from the outer edge thereof, were several boxes so spaced that each player would be adjacent to some one of them. Such boxes were "square", "with glass sides", and had "seventy-five compartments" in the bottom thereof, in five rows, numbered from 1 to 15 in the first, 16 to 30 in the second, etc. An attendant then passes around on the opposite side from the players and gives to each player one or more cards, for which he collects ten cents each. Each player is then given a ball, called a "skill ball". An attendant then "starts around" with what is called a "game ball" of a different color, and each player in turn tosses such ball into the box adjacent to him. When the ball settles in one of the seventy-five compartments the number thereof is indi-

cated on a "chart" which is visible to all players, and each of the players having such number so displayed on his card or cards places a marker over such number thereon. Each card has twenty-five small squares, in five vertical columns of five squares each, each square, with the exception of the center one, being numbered. Such center square is marked "free". The squares in the first column contain numbers ranging from 1 to 15, the second from 16 to 30, the third from 31 to 45, the fourth, 46 to 60, and the fifth, 61 to 75, and each card has an arrangement of such numbers different from every other card. The game ends when some player secures a straight line of markers across his card, either laterally, diagonally or vertically, or four markers in any line of which the "free" square is the center. Such player receives the prize. The skill ball is used by a player at any time he deems appropriate, and the number of the compartment into which such ball finally falls is marked on such player's card only, if his card has such number on it. A rubber ball is used, and "as a rule it would bounce around and finally settle down into a hole". If more than one completes a line at the same time the prize is divided between them. The prizes which the witnesses saw distributed were merchandise of some value.

It will be seen from the description of the manner of playing the game that chance plays a very large part in selecting the numbers, and that the part skill could play is extremely small. If the player at the end of the line is lucky he would win the prize before his turn to throw the game ball came. It is evident that even if a player who throws the game ball used also his skill ball, and was skilful or lucky enough not to miss a shot, he would still be dependent upon the chance that other players would be able to settle the ball into compartments with the numbers required to complete two out of four squares in the "free-square" lines, or three out of five in any other line. In our opinion the evidence supports the implied finding of the board that the game is one of chance and not of skill.

A game similar to that played under the permit here mentioned was held to be gambling under an Oregon statute almost identical with section 330 of our Penal Code (*State v. Randall*, 121 Or. 545 [256 Pac. 393]), regardless of the

fact that the element of skill might be present in some small degree.

Petitioners urge that "in determining the extent to which chance must have a part to render a game a lottery we are confined to the law as it exists in this state", and point to the case of *Ex parte Shobert*, 70 Cal. 632 [11 Pac. 786, 59 Am. Rep. 432], which held a transaction not to be a lottery under section 319 of the Penal Code, which the United States Supreme Court condemned as such. (*Horner* v. *United States*, 147 U. S. 449 [13 Sup. Ct. 409, 37 L. Ed. 237].) In the Shobert case the supposed lottery ticket was one of a large series of bonds issued by the city of Brussels, which provided for repayment of principal, with interest. The only element of chance involved was in the system of determining by an annual drawing the numbers of the respective bonds which should be paid that year. It was also provided that the holders of bonds bearing the first forty numbers drawn should be paid premiums ranging from twenty-five thousand francs for the first drawn to two hundred francs for the last. It will be seen that the purchaser of such a bond obtained value for his money. The chance was given him, if lucky in the drawing, to get a return of his principal and interest in a short time, and also to participate in a special prize. Of this latter the court said that it was no doubt an inducement to make the purchase, "but it did not constitute the main feature and substance of the transaction between the government and the purchaser of the bond. It was a mere appendage and an incident to its main purpose, by means of which the holder might by chance receive a larger sum than the principal and interest which the bond provided". We see no parallel between such a bond and the card purchased here for ten cents. With the first, the purchaser takes simply the ordinary business risk to some degree present in any investment he makes, so far as his principal and a fair return are concerned. In the other, he either gets a prize or nothing. We find no case which holds that where chance is the main factor in determining the right to a prize in group playing it becomes a legal method of awarding the same, just because the element of skill may also be present in some small degree.

In our opinion, therefore, there is substantial support in the evidence for the finding of the board that the game is in violation of section 319 of the Penal Code. Hence its decision upon that question is conclusive. It is not necessary for us to consider whether it is also prohibited by section 330 of the same code.

A demurrer was interposed to the petition herein, but inasmuch as we have considered the case on its merits any ruling in regard thereto becomes unnecessary.

The motion to quash is granted and the proceeding dismissed.

Stephens, P. J., and Craig, J., concurred.