[Civ. No. 10395. Fourth Dist., Div. One. July 22, 1971.]

JOHN ALAN FINSTER et al., Plaintiffs and Appellants, v. JAMES DON KELLER, as District Attorney, etc., et al., Defendants and Appellants.

**COUNSEL**

Hervey & Mitchell, Hervey, Mitchell & Ashworth and Edgar B. Hervey for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, Charles B. McKesson, Deputy Attorney General, Bertram McLees, Jr., County Counsel, Donald L. Clark, Deputy County Counsel, James Don Keller, District Attorney, and Richard H. Bein, Deputy District Attorney, for Defendants and Appellants.

**OPINION**

**WHELAN, J.**—John Alan Finster (Finster) and Doris Effie (Effie), plaintiffs, sought and were found by the trial court to have standing to seek declaratory relief whether a certain scheme for obtaining a possible large return of money for an insignificant investment is a lottery, within the definition of Penal Code section 319. They appeal from the judgment holding the scheme to be a lottery as a matter of law.

The action was against the District Attorney of San Diego County and the Attorney General of the State of California, in their official capacities (defendants).

Defendants have appealed from that portion of the judgment holding that a certain form which plaintiffs had obtained without cost and distributed gratis among the patrons of their business establishments was not

a paper, device or paraphernalia whose presence in a room kept by either of the defendants would make such defendant offend against Penal Code section 337a, and was not subject to seizure under Penal Code section 335a. Defendants argue also they have established the affirmative of a special issue pleaded that distribution of such forms violates Penal Code section 322.

The scheme in question is one known as the 5-10, operated and managed by what is popularly known as the Caliente Race Track (Caliente) in Tijuana, Baja California, Mexico.

Under that scheme, one who wishes to participate attempts to select in advance the winners of the fifth through the tenth races to be run at Caliente on either Saturday or Sunday of each week; such participant or player must place the numbers of his selections in spaces afforded on a printed form. The numbers are those assigned on the day's program to horses whose names appear as entries on the program. He must also place in other spaces provided the number of an alternate selection in each of those six races. In person or otherwise he must turn in the form at Caliente before post time of the fifth race on the chosen day, accompanied by two dollars or any multiple thereof, and receive back a validated duplicate of the original which is retained by the Caliente management.

The rules governing the operation of the 5-10 are printed on the duplicate form that is to be filled in with the selected hoped-for winners. The forms are printed on special paper made by the National Cash Register Company and each double form bears a serial number. One part of the double form is sensitized so that the lower part receives the impressions of the numbers written on the upper part. The forms are furnished at the track by the management and are made easily available in large numbers. Only that form may be used and only that form is recognized by the Caliente management.

The player may fill in as many forms as he wishes with wholly different selections or with combinations of selected winners and turn in such forms with the required contributions.

Those payments are held by the Caliente management in what is called the 5-10 pool, and from it is deducted the track's percentage. The remainder is divided into two parts: 75 percent is paid to the participant or divided among the participants who have picked six winning horses in proportion to the amount of their respective contributions. If no one has selected six winners, the winner's portion goes to that one or those with the largest number of winning horses; the other 25 percent of the prize money is divided among those who have selected winning horses next greatest in num-

ber after the number of winning horses selected by those receiving the 75 percent of the pool.

In the event a horse listed among the first choices should be scratched, the alternate horse in that race fills the place. If both should be scratched, the eligible horse next listed in the list of entries after the player's first selection fills the place.

There was testimony of experts that there are substantial elements of chance that even an informed and intelligent student of the form, pedigree, record and condition of horses entered in a certain race with relation to the length of the race, the rider, trainer, weight carried, number and quality of the other entries, probable condition of the track, and such other factors as might affect the outcome of the race, would be able to select the winning horses in six successive races.

Such a bettor, if he were accustomed to winning about 40 percent of his wagers, would have about one chance in 250 of winning the 5-10.

An unskilled bettor who made his selections on some haphazard or arbitrary scheme, would have about one chance in 999,999.

Plaintiffs' arguments that the 5-10 scheme is not a lottery come under three headings.

 It is argued first the requirement is not met that in a lottery an agreement, understanding, or expectation that the property be distributed by chance, since there is no showing the race track operators agreed or consented the pool would be distributed by chance, and the management must be a party to the agreement; since there is no meeting of the minds, there is no agreement.

The nature of the plan in its rules and its operation determines whether the distribution is by chance. The absence of any verbal declaration to that effect is of no consequence. There is no question as to the understanding of the manner in which the pool is to be divided. Chance determines the manner of division and the requirement of the statute is met.

The second argument is based upon section 19 of article IV of the California Constitution, which reads: "(a) The Legislature has no power to authorize lotteries and shall prohibit the sale of lottery tickets in the State. "(b) The Legislature may provide for the regulation of horse races and horse race meetings and wagering on the results."

The argument is two-pronged. One branch derives from the difference in language of the present section and that of section 26 of article IV of the 1879 Constitution which it replaced. The 1879 provision read: "The

Legislature shall have no power to authorize lotteries or gift enterprises for any purpose and shall pass laws to prohibit the sale in this State of lottery or gift enterprise tickets or tickets in any scheme in the nature of a lottery."

▪ It is argued that the present section is narrowly directed at what may be called the classical lottery; the 1879 provision, now eliminated, was intended to be more comprehensive in its proscription.

The present constitutional provision was adopted in 1966. By that time the earlier narrower meaning of lottery had been abandoned by the courts.[1]

In *People* v. *Rehm*, 13 Cal.App.2d Supp. 755, 758 [57 P.2d 238], the court said: "Schemes, in which ratiocination was given a part in the hope that it would dress the chance up sufficiently so that it would not be recognized, have been discussed, however. . . . So it has been that contests wherein, seemingly, deductive reasoning would play a great part, have been held lotteries."

The present constitutional provision, equally with the earlier provision, is directed at any scheme by whatever name it might be called that falls within the meaning of lottery in common usage.

▪ Plaintiffs say correctly that not every game of chance is a lottery, and argue that if the 5-10 is a game of chance it is, nevertheless, not a lottery.

It is argued that because under subsection (b) of section 19 of article IV the Legislature has provided for wagering on the results of horse races and horse race meetings, no such wagering provided for by the Legislature can be called a lottery.

We disregard the possible argument that subsection (b) is an exception to subsection (a) which states the Legislature has no power to authorize lotteries.

We note, however, that if it be arguable that all wagering on the results of horse racing is a lottery, the second paragraph of the section has equal standing with the first and to that extent might be considered as an exception thereto.[2]

---

[1]"In determining whether the contract is in the nature of a lottery, we look, not to the name, but the game. Courts will not tolerate subterfuge, however ingenious may be the scheme devised to evade the law. . . . The mere fact that the winners are determined by the number of votes received does not, in this particular scheme, eliminate the element of chance. . . ." (*National Thrift Ass'n.* v. *Crews*, 116 Ore. 352 [241 P. 72, 73, 41 A.L.R. 1481, 1483-1484].)

[2]A bet between only two persons upon any contingency, including a wager that a certain horse will or will not win a certain horse race, is not a lottery, even though

In fact the Legislature has provided for wagering on horse races under severe restrictions. With a limited exception, the wagers on each race must be pooled separately. The exception is for the "daily double" selections for which there is a separate pool.

In theory, in the daily double the amount wagered by a player who has picked the winner of the first of the two races wins him a share of the pool for first place proportionate to the number of those picking the winner; that all such winnings remain in the pool to be divided after the second of the two races among all who have picked the winners in both races. The result to each of the winners is much as if he had parlayed or re-bet upon the second race the proceeds from picking a winner in the first race. If either selection fails to win, the punter's entire wager is lost.

The argument proceeds that if the daily double is legal in California, it cannot be a lottery; if it is not a lottery then the 5-10 is not a lottery.

The argument is reinforced by reference to an opinion of the Attorney General (36 Ops.Cal.Atty.Gen. 150) that since the horse racing board and the Legislature had authorized the daily double a scheme known as Pic-Six also might be authorized. The Pic-Six scheme we assume is in essence like the 5-10 scheme.

Penal Code section 319 defines a lottery as follows: "A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known."

■ Three elements must be present to constitute a lottery: (1) a prize, (2) distribution by chance, and (3) consideration. (*Cal. Gas. Retailers* v. *Regal Petroleum Corp.*, 50 Cal.2d 844, 851 [330 P.2d 778].)

There must be an understanding, agreement or expectation the distribution will be determined by chance. (*Niccoli* v. *McClelland*, 21 Cal.App. 2d Supp. 759 [65 P.2d 853].[3])

---

the party betting against the horse is a bookmaker who agrees to pay track odds, unknown when the bet is made and over which he has no control. (*People* v. *Postma*, 69 Cal.App.2d Supp. 814, 818 [160 P.2d 221].)

[3]"[A lottery is] a game in which a price was paid for a chance of a prize, and in which it purported to be determined by chance; that is, by means making the result independent of the will of the manager of the game, according to a scheme held out to the public, whether he who paid the money should have the prize or nothing." (*Commonwealth* v. *Sullivan*, 146 Mass. 142 [15 N.E. 491, 494].)

█ It is the character of the game rather than a particular player's skill or lack of it that determines whether the game is one of chance or skill. The test is not whether the game contains an element of chance or an element of skill, but which of them is the dominating factor in determining the result of the game.. (*In re Allen,* 59 Cal.2d 5, 6 [27 Cal.Rptr. 168, 377 P.2d 280]; see also *In re Hubbard,* 62 Cal.2d 119 [41 Cal.Rptr. 393, 396 P.2d 809] (overruled on other grounds in *Bishop* v. *City of San Jose,* 1 Cal. 3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137]); *Einzig* v. *Board of Police Commrs.,* 138. Cal.App. 664 [32 P.2d 1103]; *Commonwealth* v. *Plissner* 295 Mass. 457 [4 N.E.2d 241, 245].[4])

In a game of skill, fairly played among competitors, such as bridge, the participants continue to make their individual judgments until the hand has been played. In that sense they exercise some control over the outcome.

The Supreme Court said of the game of bridge: "[I]t is obvious that, although there is of course an element of chance resulting from the deal of the cards, there is a continually recurring necessity in the bidding and play of the hand to make decisions which, considered together, will ordinarily be determinative of the outcome of the game." (*In re Allen, supra,* 59 Cal.2d 5, 7.)

█ The 5-10 rules would not permit a change in the selections on a given form after its validation, although a form for the Saturday races might have been validated as early as 10 a.m. of the preceding Thursday, and that for Sunday as early as 10 a.m. of the preceding Friday. It would be possible for the player to fill out and have validated thereafter one or more other cards to reflect a change in his selections.

At best, however, between post-time of the fifth race on the day for which he had a validated form and the start of the tenth race, no judgment of the player based upon a change in the condition of the horse, rider or track could be given effect.

Under the 5-10 plan, all opportunity for the player to exercise judgment ceases when the fifth race begins. Any skill and judgment displayed thereafter are those of the jockeys. The actual outcome of any race then depends upon elements wholly beyond the control of the player.[5]

---

[4]There is a useful discussion as to the combination of luck and skill in certain multiple contests open to an unlimited public in *State* v. *Globe-Democrat Pub. Co.,* 341 Mo. 862 [110 S.W.2d 705, 714-715, 717-718, 113 A.L.R. 1104, 1116, 1120].

[5]"[T]he awarding of the prize will depend upon the judges' selection of a list of uses in accordance with their arbitrary views and without definite and fixed rules of reason. Even conceding the integrity of the judges and the fixing by them of some common ground of primacy, it is nevertheless obvious that whatever ground of certainty is attained must be reached by an inescapable element of chance. Considered

If skill and judgment be assumed upon the part of all the players, the known results in many instances show a large element of chance. The pool has been divided in many instances among players none of whom selected more than four out of the six winning horses.

If the award were in recognition of the skill and judgment of the player, the award should be made not upon the basis of the selection of horses that in the event happen to win, but upon the selection of those horses upon whose form, taken with all the other probable foreseeable factors, the results of the races most properly would be determined.

In that situation the language is apt which was quoted in *State* v. *Globe-Democrat Pub. Co.*, 341 Mo. 862 [110 S.W.2d 705, 715], from *Barclay* v. *Pearson*, 2 Ch. 154, that "if the contest had been to supply the *most appropriate* word, it would have been different."

Chance affects the result not only as to the person or persons to receive the pool proceeds, but as to the amount received by any winning player, since more than one player may have selected the highest number of winners in the races of a particular day.

It may be inferred from the extensive distribution of the official forms in San Diego that some number of the players do not go to the track on the day for which they have made selections; as to such players the actual condition of the horses just prior to post-time will be wholly unknown. As to a player who might go to the track, he has no meaningful opportunity to view the apparent condition of the horses before any but the fifth race.

The code definition is not that of the lottery in its original and simplest form, in which there is a drawing of one or more numbered slips, cards or counters from a wheel or drum, and the participant who has purchased a ticket bearing any such number drawn is a winner.[6] From that original form there have been several variants such as the Dutch lottery and Genoese lottery.[7]

---

in that light, the conclusion is irresistible that the prize will go to him who is the most fortunate in guessing how the judges will finally compose their differences." (*National Conference on Legalizing Lotteries* v. *Farley*, 96 F.2d 861, 863.)

[6]"The mechanics of a lottery is essentially as follows: Tickets bearing different numbers are placed on sale, and a date set for a drawing. On that date is set up a device which contains numbered duplicates of all the tickets sold, and one or more numbers are drawn at random. From the money realized by the sale of the tickets, the proprietors of the lottery deduct some amount, arbitrarily determined, for expenses and profits; the remainder is paid to the holders of tickets corresponding to those drawn." (10 Ency. Brit. (1951 ed.) p. 12.)

[7]The Genoese lottery is a scheme by which, out of 90 consecutive numbers, five are to be selected or drawn by lot; the players having fixed on certain numbers, wagering that one, two or more of them would be drawn among the five, or that they would appear in a certain order. (*Fleming* v. *Bills*, 3 Ore. 286, 291:)

The numbers game, which has been held to be a lottery, is readily seen as a variant

■ The drawing of a number is not required under the definition of Penal Code section 319. (*Niccoli* v. *McClelland, supra,* 21 Cal.App.2d Supp. 759; *People* v. *Rehm, supra,* 13 Cal.App.2d Supp. 755.)

■ The official 5-10 form uses the word "pool" to describe the fund made up of the subscriptions. Undoubtedly it falls within the meaning of pool as used in Penal Code section 337a, subdivision 2, upon the result of a lot, or chance. ■ " 'Pool selling' is the 'selling or distribution of shares or chances in a wagering pool.' " (*People* v. *Coppla,* 100 Cal.App.2d 766, 768 [224 P.2d 828].)

■ At the same time, the 5-10 plan is the plan of a lottery.[8]

■ Defendants contend that the possession in California of the blank 5-10 forms is a violation of law so as to make them subject to seizure under Penal Code section 335a. They do not point to the statute that in terms penalizes their possession. Penal Code section 335a does not do so explicitly or by implication.[9]

Defendants rely rather upon the theory that possession of the forms for the purpose of delivering them to interested persons gives rise to an inference that Penal Code section 337a, subdivision 2 has been violated. That subdivision in part reads as follows: "Every person,

" . . . . . . . . . . . . . . . . . .

"2. Who, whether for gain, . . . or gratuitously, . . . keeps or occupies . . . any room, . . . building, . . . place, . . . or enclosure, . . . or any part thereof, with . . . books, . . . papers, apparatus, de-

---

of the Genoese lottery. In the usual form of the numbers game, the player tried to guess three numbers (such as the three final digits of the daily clearing-house receipts) which would surely appear in the daily newspapers and could not possibly be influenced by the operators of the game. (10 Ency. Brit. (1951 ed.) p. 13.)

[8]"A scheme wherein the bettors attempt to choose a number of winners of athletic contests selected by the operator where the payoff is dependent upon the odds assigned to the selection of a given number of winners has been held to be a lottery." (38 Am.Jur.2d, Gambling, § 67, pp. 162-163, § 74, p. 168; see also *Territory* v. *Sur,* 39 Hawaii 332, and *Commonwealth* v. *Laniewski,* 173 Pa.Super. 245 [98 A.2d 215].) "[W]here a contest is multiple or serial, and requires the solution of a number of problems to win the prize, the fact that skill alone will bring contestants to a correct solution of a greater part of the problems does not make the contest any the less a lottery if chance enters into the solution of another lesser part of the problems and thereby proximately influences the final result." (*State* v. *Globe-Democrat Pub. Co.,* 341 Mo. 862 [110 S.W.2d 705, 717, 113 A.L.R. 1104].)

[9]If there is a widespread use of the forms in San Diego County in violation of Penal Code section 337a, subdivision 3, as testified to by the district attorney, it is within the power of the Legislature to direct its proscription at the possession of any such form that, if filled in according to directions, might be used as an application for a lottery ticket.

vice or paraphernalia, for the purpose of recording or registering any bet, . . .. wager, . . . or of selling pools . . . upon the result . . . of any . . . contest . . . of skill, speed or power of endurance of man or beast, or between men, beasts, . . . or upon the result, . . . of any lot, chance, casualty, unknown or contingent event whatsoever . . . [6.] . . . is punishable by imprisonment in the county jail for . . . not more than one year or in the state prison for a period not exceeding two years."

■ Defendants contend also that the plaintiffs were not entitled to declaratory relief upon the facts alleged in their complaint. Since plaintiffs alleged a threat of prosecution and seizure of the forms merely because of the possession of them in their unfilled-in condition, they were entitled to a declaration whether they might possess and distribute the blank forms free from such threat.

■ There was some testimony from which it might be inferred that some persons used the 5-10 forms to enter a list of selections to satisfy idle curiosity as to how many winners they could pick, without ever having the forms validated.

The district attorney testified that if the police should arrest a merchant for giving away one of the forms, he would prosecute such merchant for a violation of Penal Code section 337a, subdivision 2. He had information from the police that many of the establishments supplying 5-10 forms to their customers were, with increasing frequency, sending completed forms and wagers to Caliente for their customers. He was of the opinion, in which the Attorney General concurred, that the forms, whether or not completed, were subject to seizure and destruction pursuant to Penal Code section 335a whenever and wherever they might be found under the laws of reasonable search.

Penal Code section 335a provides in part as follows: "In addition to any other remedy provided by law any machine or other device the possession or control of which is penalized by the laws of this State prohibiting lotteries or gambling may be seized by any peace officer, . . ."

The trial court rightly held that the occupation of an enclosure for the purpose of distributing the forms in the manner described by the plaintiffs does not, based solely upon that fact, violate Penal Code section 337a, subdivision 2 and that such forms held solely for distribution in the manner described by the plaintiffs are not subject to seizure and destruction pursuant to Penal Code section 335a.

■ We interpret subdivision 2 of Penal Code section 337a to mean that the place occupied is one in which the paraphernalia for recording bets or selling pools is used for that purpose. (*People* v. *Jerman,* 29 Cal.2d

189 [173 P.2d 805]; *People* v. *Greco,* 47 Cal.App.2d 628, 632 [118 P.2d 886].)

■ The keeping of premises in which were present the forms in their unfilled-in state would not of itself constitute a violation of Penal Code section 337a, subdivision 2. The violation requires that the premises be kept for the purpose of recording bets or selling pools therein. The mere possession of paraphernalia of a nature adapted to the recording of a bet or of a chance in a pool-selling scheme has not been penalized, nor has the keeping of premises containing such paraphernalia unless it be for the purpose of recording bets or selling pools within the premises.

■ For a violation of Penal Code section 337a, subdivision 2, it is essential that the person charged (1) keep or occupy the room, (2) that the room contain specified paraphernalia, and (3) that the occupancy and paraphernalia are for the purpose of recording or registering bets. (*People* v. *Foreman,* 112 Cal.App.2d 616, 619 [246 P.2d 979]; *People* v. *Woods,* 35 Cal.2d 504, 508 [218 P.2d 981].)

■ It is argued, however, that possession of the blank forms, with other evidence directed toward the possessor, could give rise to an inference that such possessor was in violation of Penal Code section 337a, subdivision 2.

We do not doubt that is so. There are several different crimes in which such forms could play a part, and the seizure of them as instruments of the crime would be justified if there were probable cause to believe any such crime had been committed.

Although, for a player who intended to and did go to the track, where the forms are easily available, there might seem to be no reason to obtain a form in San Diego, it might, nevertheless, be convenient to do so and to fill in the form at leisure beforehand.[10]

However, the number of forms distributed in San Diego gives rise to a question whether large numbers of them might not be filled in by persons who delivered them, with money, to other persons for carriage to the track.

Unless one or more of them have been filled out, and in that condition are in the hands of someone other than the person or persons who filled them out, an inference hardly arises that they are about to be used along with money to be taken to the race track.

The 5-10 forms are not lottery tickets at any point prior to their validation. ■ A lottery ticket is a token of a right to participate in the

[10]The state law does not prohibit the possession of a single lottery ticket by an individual. (*People* v. *Cole,* 226 Cal.App.2d 125, 127-128 [37 Cal.Rptr. 798].)

pool (*Francis* v. *United States,* 188 U.S. 375 [47 L.Ed. 508, 23 S.Ct. 334]); there is no lottery ticket unless it has been delivered to a player in exchange for payment, or unless it is in a completed form available for such delivery.[11]

■ The 5-10 plan is the plan of a lottery, and the pool for each separate day in the plan is a lottery.

Defendants raised an issue that the 5-10 form constitutes an advertisement of a lottery within the proscription of Penal Code section 322.

No finding was made on the issue.

Counsel for Finster and Effie states in his brief he "must still say that he feels that the 5-10 form inescapably advertises the 5-10 . . ."; but denies that the 5-10 is a lottery. Defendants agree that if the 5-10 is a lottery the 5-10 form advertises a lottery.

Penal Code section 322 is as follows: "Every person who aids or assists, either by printing, writing, advertising, publishing, or otherwise in setting up, managing, or drawing any lottery, or in selling or disposing of any ticket, chance, or share therein, is guilty of a misdemeanor."

Conduct in California that furthers a lottery venture in another jurisdiction where such lottery is legal may violate California law. (*People* v. *Jones,* 228 Cal.App.2d 74, 92 [39 Cal.Rptr. 302].)

The 5-10 form sets out the rules of a lottery scheme, and tells when and where the scheme is in operation. The following is printed in large type on the face of the form: "5-10 Caliente! Betting The Caliente Handicapping Cash Pool."

While the large print on the face of the form might serve merely to identify the form for the benefit of those to whom the 5-10 plan was already known, the delivery of one of the incomplete forms is akin to the passing out of an advertising dodger, and thus advertises or publishes the lottery.

The 5-10 form plays an important and perhaps essential part in the lottery scheme, although the possession of one of the forms would be useful in connection with any of the single twice-weekly pools only in conjunction with a list of the entries in the fifth through the tenth races of a specific day.

---

[11]*Champion* v. *Ames,* 188 U.S. 321 [47 L.Ed. 492, 23 S.Ct. 321], upheld a conviction based upon the carriage from Texas to California of numbered lottery tickets. It may be inferred the owners of such tickets had paid the operators of the lottery for them and would resell them in California for the face price; that if not so resold they would nevertheless represent a right to participate in the lottery.

The evidence here shows that Finster read of an opinion by the Attorney General that the 5-10 was a lottery and that anyone who gave away or in any manner transferred any of the forms would be guilty of a misdemeanor. Until then Finster had distributed about 500 of the 5-10 forms monthly among certain of the retail customers of his wholesale business as a distributor of horse-racing publications. Upon request by the retailer, the forms were delivered along with the publications as a matter of good will. One of the publications distributed by Finster was the Daily Racing Form—Caliente Edition, which contains lists of horses entered in 5-10 races not yet run. Upon reading of the Attorney General's opinion Finster ceased that practice.

Effie, who owned a liquor store, was a customer of Finster, who furnished her with the 5-10 forms. Effie's patrons who purchased publications containing racing information had been accustomed to taking the 5-10 forms which she had made available to the number of about 150 weekly to anyone who entered her store until Finster ceased to distribute them. Most of the blank forms were taken by customers who purchased Caliente racing forms containing lists of horses entered in races. She believed her customers liked to be able to get the racing forms and the 5-10 forms together so they could "figure out" the 5-10 before going to the track. In fact, she noticed a definite decline in the sale of racing periodicals after she removed the 5-10 forms from her store.

It may be inferred persons who desired such 5-10 forms and lists of entries contained in the "racing form" referred to in evidence for future races to be run on a Saturday or Sunday, and who obtained such 5-10 forms and racing forms from Effie, did so for the purpose of paying for the validation of the form at the race track.

It would be naive to suppose the forms in any great number fail to find their way back to the race track. They are separately numbered and expensively produced. If self-interest is an effective check upon economic waste, it may be inferred that the forms in great part are put to the use for which they are intended.

To supply the 5-10 form together with a list of entries for races still to be run on one or more specific days upon which the lottery was to be in operation could be found to offend against Penal Code section 322 by aiding or assisting in the selling of tickets in the lottery. The court should have ruled on that issue.

It might be found that in supplying such 5-10 forms to purchasers of racing forms containing lists of entries in races yet to be run on a Saturday or Sunday, Effie was indirectly aiding and assisting in the sale of the validated forms, which must be considered to be lottery tickets.

At one step removed, it might be found that Finster likewise was aiding in such sales by obtaining such forms in wholesale quantity and furnishing them to his dealer customers with racing forms for retail distribution by them.

The 5-10 forms used in such a manner could become an instrumentality of the crime of aiding and assisting in the sale of lottery tickets.

The judgment is affirmed insofar as it holds that the 5-10 in its plan and method of operation is a lottery; it is reversed insofar as it fails to find on the special issue that the distribution of the 5-10 forms by the plaintiffs in the manner shown by the evidence violates Penal Code section 322; the case is remanded with instructions to find affirmatively on that special issue. The defendants shall recover their costs on appeal.

Brown (Gerald), J., and Coughlin, J., concurred.

A petition for a rehearing was denied August 3, 1971, and the petition of plaintiffs and appellants for a hearing by the Supreme Court was denied October 6, 1971.