[No. B068368. Second Dist., Div. Seven. July 11, 1995.]

BELL GARDENS BICYCLE CLUB et al., Plaintiffs and Respondents, v. DEPARTMENT OF JUSTICE et al., Defendants and Appellants.

## Counsel

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, and Michael J. Weinberger, Deputy Attorney General, for Defendants and Appellants.

Seyfarth, Shaw, Fairweather & Geraldson, Jerry M. Hill, Alexander H. Pope, David J. Jacobson, Steven B. Katz, Caldwell & Kennedy, Terry E. Caldwell, Testa & Grady, James A. Testa, Dear & Kelley and Richard D. Dear for Plaintiffs and Respondents.

## Opinion

**WOODS (Fred), J.—**

### I.

### Introduction

In this action coordinated from separate complaints filed in Alameda, Los Angeles, San Bernardino, and San Diego Counties, plaintiffs (or Card Clubs) obtained an injunction against defendant state and local officials from enforcing prohibitions against the play of jackpot poker.

Specifically, in August 1989 through January 1990, plaintiffs filed actions seeking declaratory and injunctive relief in the following cases: (1) Bell Gardens Bicycle Club et al. v. California Department of Justice (Super. Ct.

L.A. County, No. C 735377) consolidated with Anthony Co. v. Van de Kamp (Super. Ct. L.A. County, No. C735460); (2) Tibbetts v. Van de Kamp (Super. Ct. Alameda County, No. 656612-0); (3) Casino Plaza, Ltd. v. City of Adelanto (Super. Ct. San Bernadino County, No. VCV 014719); and (4) Card Club Inc. v. Department of Justice (Super. Ct. San Diego County, No. N46140).

The Card Clubs' lawsuits arose in response to the Attorney General's August 21, 1989, opinion which stated that jackpot poker played for money in California is unlawful because it violates both constitutional and Penal Code proscriptions against lotteries. On and around September 20, 1989, registered California card club owners were sent a letter informing them of the Attorney General's 1989 opinion, and advising them that beginning November 1, 1989, the playing of illegal jackpot poker constitutes a violation of the Penal Code which may result in administrative disciplinary action being taken by the State Gaming Registration Program as well as *possible* criminal prosecution.

The matter came before the Los Angeles County Superior Court on motions and cross-motions for summary judgment. On February 19, 1992, all counsel stipulated that the trial court could decide the entire matter "on the basis of the argument, authorities and admissible evidence contained in [the] moving and responding papers . . . and the previous court files." All parties agreed that the stipulation was "effective whether or not the Court determines that there are triable issues of fact," and that any such triable issues were to be decided by the court on the basis of the admissible evidence submitted.

On March 31, 1992, after a hearing, the court found for the Card Clubs and against the State of California. Specifically, the trial court found: "The issue to be decided is whether Jackpot Poker is an illegal lottery under Penal Code section 319, or an adjunct to poker, requiring a comparable level of skill to poker, and therefore lawful on a local option basis under Penal Code section 330. This court concludes that jackpot poker is not a lottery and will enter judgment for plaintiffs."

On June 16, 1992, the state defendants filed a timely notice of appeal.

## II

### FACTS AND PROCEEDINGS BELOW

A. *The Basic Jackpot Game*

The 1989 Attorney General's opinion generally describes the difference between poker with and without the severable jackpot feature:

"In the game of *draw poker*, including lowball poker, each player 'antes' an agreed amount to the 'pot' before play starts. The cards are then dealt to each player. The players then bet by placing more in the pot or 'fold' withdrawing from the game depending upon the strength of their hands. Those who bet discard unwanted cards and 'draw' the same number of new cards from the dealer in an attempt to improve their hands. The players then bet by placing more in the pot or fold, withdrawing from the game. The player remaining in the game having the best poker hand as determined by the rules of the particular form of draw poker being played, wins the pot.

"In *jackpot poker* a fixed sum is withdrawn from the pot in each game of lowball poker played which is placed in a *separate fund known as the 'jackpot'*. In some cases the operator of the cardroom places money in the jackpot from other sources, especially when the jackpot is low. *The money in the jackpot accumulates* until a player in a lowball game achieves a hand with a particular combination of cards under specified conditions which make him the winner of all the funds in the jackpot. As explained to us the best possible lowball hand is a five-four-three-two-ace, often called a 'wheel' and the second best hand is a six-four-three-two-ace, often called a 'sixty-four'. Under the jackpot poker rules the winner of the jackpot is the player who holds a 'sixty-four' hand when another player has a 'wheel' and thus wins the pot. *The jackpot feature does not interfere with the regular lowball poker play except for the withdrawal from each pot for the jackpot.*" (72 Ops.Cal.Atty.Gen., 143, 144 (1989), italics added.)[1]

## B. *The Issues in This Case*

It was and is the view of the Attorney General and of law enforcement that the jackpot element appended to such games as draw poker, Texas Hold'em, and seven-card stud is an illegal lottery prohibited by Penal Code section 319 and California Constitution article IV, section 19, because it contains "all three elements of an illegal lottery, which are as follows: Prize . . . Chance . . . [and] Consideration."

Pleadings filed during the course of this litigation established that the Card Clubs do not dispute that their jackpot games contain the "prize and consideration," elements of a lottery. The Card Clubs dispute, however, that "chance predominates over skill in Jackpot poker."

With respect to the element of chance, the 1989 Attorney General's opinion described the basis for its conclusion in part as follows:

---

[1]The essential ingredients of all jackpot poker games are the same. Each game, in whatever club or county, provides a jackpot for players who obtain a certain specified hand or combination of cards.

"The principal issue presented by the question we are asked is whether skill or chance dominates in the determination of the winner of the jackpot in jackpot poker. To win the jackpot a player must not only remain in a lowball game with a 'sixty-four' hand but another player in the same lowball game must win that game with a 'wheel'.

"It has been suggested that since the play of the lowball game determines the winners of both the lowball game and the jackpot the same proportions of skill and chance determine the winners of both. We disagree. The rules which determine the winner of the jackpot are totally different from the rules determining the winner of the lowball games. The lowest hand of the players who haven't folded determines the winner of the lowball game and provide[s] a winner for every lowball game. *But the jackpot rules require that two players hold specific unusual hands in combination to make the holder of one of those hands the jackpot winner, an event which occurs very infrequently in the playing of many lowball poker games.* As the Supreme Court said in the *Allen* case [*In re Allen* (1962) 59 Cal.2d 5 (27 Cal.Rptr. 168, 377 P.2d 280, 97 A.L.R.2d 1415)] it is the character of the game as revealed by its rules that the courts look to in determining whether the elements of skill or chance predominate in determining the winner. The differences in the rules which determine the winner of the lowball games and the winner of the jackpot involve different elements of chance and skill. We therefore examine the rules determining the jackpot winner to determine whether the elements of skill or chance predominate.

"Since the jackpot winner is determined by the cards held by the players who have not folded at the end of a lowball game the first step in determining the jackpot winner is the initial deal of the cards in the lowball game. The cards that each player is dealt are determined solely by chance if there is an honest deal as the rules require.[2] The second step is the discard, the only action a player may take which will affect what cards he will hold at the end of the game. There would appear to be little skill involved in making the discard if the player's objective is to win the jackpot. He would discard any card which was not part of a 'sixty-four' hand which would make it possible for him to achieve a 'sixty-four' hand by the draw. The third step which will determine the jackpot winner is the draw. If the cards received in the draw are dealt honestly as the rules require they are determined solely by chance as in the initial deal. Finally, for a player to win the jackpot another player

---

[2]"The probability of being dealt a five high straight (a 'wheel') on the initial deal is 1024 in 2,598,960 or one in 2538. (Scarne on Cards by John Scarne, Crown Publishers, N.Y., 1949, p. 281.) The probability of being dealt a 'sixty-four' on the initial deal would be the same, one in 2538."

must win the lowball game with a perfect hand, a 'wheel', a matter which involves the same elements of chance and skill as obtaining a 'sixty-four' hand. The betting would appear to have little impact on the determination of the winner of the jackpot. The player who holds a 'sixty-four' hand or a potential 'sixty-four' hand must match any bets made to remain in the game and remain eligible to win the Jackpot. . . . We are convinced that the courts would hold that the elements of chance predominate over the elements of skill in determination of the winner of the jackpot in jackpot poker.

"We conclude that jackpot poker, played in the manner described herein, constitutes a lottery which is prohibited by state law. Because it is a lottery the Legislature 'has no power' to authorize jackpot poker by statute or otherwise. See article IV, section 19(a) of the California Constitution, *supra*." (72 Ops.Cal.Atty.Gen., *supra*, 143, 148-149, italics added.)

C. *Summary of the Facts*

Discovery responses, particularly the interrogatories and requests for admission in this case further clarified and highlighted the following facts pertinent to the elements of a lottery in the Jackpot games:

1. *The Game.*

The jackpot is not integral to the game of poker and poker exists without it.

2. *Prize.*

The prize designated as the jackpot in jackpot poker is an independent sum of money separate from the common "poker" pot. The common "poker" pot is distributed at the end of each game to the winner of that game and is composed of the wagers or bets made within the game itself. The jackpot prize is money that is set aside by the club for the jackpot award and is a sum beyond that contributed by the player at the table. The jackpot prize accumulates over time until it is won.

3. *Consideration and the Accumulation of Prize Money.*

The consideration element of a lottery is present by the fact that funds are set aside from each jackpot game exclusively for a jackpot award or in the form of cardroom participation or entry fees. In general at plaintiff Card Clubs, "Each player 'antes' an agreed amount to the 'pot' before play starts. The cards are then dealt to each player. The players then bet by placing more

in the pot or withdrawing from the game ('folding'), depending upon the strength of the player's hand. . . . In Jackpot Poker [at the outset of the game], a fixed sum is withdrawn from the 'antes' in each game of lowball poker which is placed in a separate fund known as the 'jackpot'."

The jackpot fund accumulates separately from the funds in the poker games, and generally, when "the Jackpot amount is removed," it is "deposited into a locked 'drop box' located below the table surface. . . ."

### 4. *The Element of Chance in Jackpot Poker Games.*

Both the plaintiffs' expert Mike Caro and the state's expert Dr. David Aldous testified about the very low probability of winning the jackpot. In short, plaintiffs' expert Mike Caro estimated that the odds of winning the California lottery game of DECCO and the odds of winning the jackpot in a jackpot poker game were similar; Mr. Caro stated that there is about 1-in-28,560 chance of winning DECCO and no better than 1 chance in 23,692 of winning the jackpot in 7-card stud jackpot poker with 7 players who stay in the game to completion.

The Card Clubs further acknowledged during discovery that the unskilled player who chooses to play each hand to its completion would, over a long period of time (assuming the availability of sufficient money to fund that strategy), probably win more jackpots than a skilled player playing the same number of hands.

Likewise, plaintiffs' expert, Mr. Caro, admitted that the presence of skillful players at a table where jackpot poker is being played " '*decreases the likelihood of a jackpot being hit.*' " (Italics added.)

Dr. Aldous calculated "how long" a more skillful player would have to play before such a player would have a 90 percent chance of winning more jackpots than a less skillful or "typical" player, and specifically Dr. Aldous determined that it would take a "professional gambler, who might play 60,000 hand a year (50 weeks, times 40 hours a week, times 30 hands an hour)[,] . . . much of a lifetime [or 2,750,000 games] in order for his skill to manifest itself by winning extra jackpots."

At the Bicycle Club, jackpot awards have run as high as $70,320.

The Oceanside Club estimated that from October 1988 through the present time, approximately 750 hands of jackpot poker are played each day. The Oceanside Club awarded the following number of jackpots per month in

1990: January 1990, four jackpots were paid out; February 1990, one jackpot; March 1990, one jackpot; April 1990, two jackpots; May 1990, two jackpots; June 1990, two jackpots; July 1990, three jackpots; August 1990, four jackpots; September 1990, one jackpot; October 1990, four jackpots; November 1990, four jackpots. On July 12, 1990, the jackpot which was won totaled $18,000.

In 1988, the Commerce Club estimated that a total of 5,374,988 hands of jackpot poker were played at the club. In 1988 a jackpot award as high as $50,000 was won.

Jackpot awards at Jerry's Place have totaled as high as $25,400.

Jackpot awards at the Hi Desert Casino have run as high as $10,015.

Jackpot awards at the Normandie Club have run as high as $28,350.

Jackpot awards at the Eldorado Club have run as high as $67,000.

At the Oaks Club, the minimum and maximum jackpot awards for $4 limit lowball jackpot are $1,000 and $3,000, respectively; the minimum and maximum jackpot awards for the draw poker game are $1,000 and $5,000, respectively; and when the $20 limit game was being run, the minimum jackpot was $3,000, and the maximum jackpot was $10,000.

The Card Clubs acknowledged that in all forms of jackpot poker played at their clubs, individual players have no control over what particular card value (e.g., ace, two, three, etc.) will be dealt to them or dealt to other players because the order of the cards in the deck which is dealt is random and unknown to the participating players.

D. *The Deposition and Affidavit Opinion Testimony*

1. *Mike Caro (Caro)*

At his deposition, plaintiffs' designated poker expert, Caro, testified that he had lectured, written, and conducted research, particularly statistical research about "gaming and strategy," since 1977; for the 12 years prior to 1977, he considered himself a poker player by profession; he also played poker before 1965 and "into the mid '80's"; and he estimated that he had played about 2,000,000 hands of poker and won about 210,000 times.

Caro's "Biography" states that "Twice world champion Doyle Brunson [has] call[ed] [Mr. Caro] 'the finest draw player alive.'" The document also

provides that "[n]oted gambling authority David Sklansky rated Caro # 1 on his list of top living draw poker players. Authority John Scarne, in his book *Scarne's Guide to Modern Poker*, calls Caro one of the five best draw players in the world today."

In addition, Caro has "hosted his own tournaments, including 'Mike Caro's California World Championship.'" At one time, he had a "commercial national hot line" in which he gave "daily updated tips, commentary, odds, information and motivational lectures on real-life strategy, poker and gambling."

Caro testified that he was familiar with the manner in which jackpot poker is played at the Card Clubs; that he was familiar with the strategies involved with the various games associated with jackpot poker, and the impact of the jackpot on those strategies; the first games of jackpot poker appeared at the Bell Gardens Bicycle Club in about 1980; and afterwards other card clubs began to offer the game.

Caro stated that a prize is "something of value that is going to be awarded," and admitted that the sum of money which is won when someone wins a jackpot is a "prize"; that in order to win the jackpot in jackpot poker, you have to play the game, and in order to play the game you have to bet, and/or ante.

Caro did not have an opinion about whether chance or skill predominates in jackpot poker. Caro stated in part as follows: "To me, poker is a most skillful game, certainly one of the most skillful games there is to analyze, and jackpot adds an element of skill on top of that. What predominates, I don't know." He defined chance as meaning "the outcome of something is beyond your control."

Caro estimated that he personally had played about 4,000 hands of jackpot poker, but had won only once; that of the approximately 800 times that he played jackpot poker at the Normandie Club or the Bicycle Club, he also had never seen a jackpot hit in any game in which he had participated, the one time he won the jackpot, he "wasn't paying any attention to the game," and that he "was probably displaying no skill" at the time; the presence of more skillful players at a table "*decreases* the likelihood of a jackpot being hit" (italics added); based upon his experience at the Bicycle and Normandie Clubs, "there tends to be a greater proportion of unskilled players in the jackpot games."

At his deposition, Caro testified about his statistical analysis of the seven-card stud jackpot poker game; the analysis used a computer simulation

of 5,500,000 hands of 7-card stud jackpot poker played by 7 persons, all of whom stayed in each game to its completion, i.e. the showdown. Specifically, Caro described the way his analysis was done as follows: "[T]his particular study was five and a half million hands of jackpots with a table of seven players and each time a Jackpot was possible, it printed out the hands and the order of the arrival of the cards. [¶] It also kept track of exactly which values of hands were involved in the jackpots. How many times they won. How many times they lost. Total number of jackpots out of 5,500,000 hands, assuming players stayed to the end. And that was essentially what I did;" Caro did not take into account the skill of the players as part of the simulation.

When the 7 poker players "played" 5,500,000 games, there were 1,625 Jackpots hit, or 1 jackpot hit about every 3,385 games played among the 7 players at the table. Caro explained that any one "individual would have a much less chance of being the recipient of that jackpot" because the 3,385 jackpots-won figure was a total "per table" figure; he concluded that an individual's chance of winning the jackpot when 5,500,000 games (consisting of 38,500,000 hands) are played is about "one in 23,692"; and when there are 8 players who play each game to its completion, he estimated that an individual's chance of winning the jackpot is about 1 chance in 20,307.

Caro explained that the reason that seven hands were used instead of eight hands in his initial calculations "is because there are not enough cards to deal to a showdown for eight players. So seven players is the maximum, and that's what we did"; he acknowledged that when the number of players or hands played to showdown is reduced, the number of jackpots hit would decrease, as well.

Caro emphasized that the figures such as in the 1 in 23,692 and 1-in-20,307 chance of winning the jackpot in a 7-card stud poker game played by 7 or 8 persons, respectively, represented the "very best a player could hope for," in the game; he acknowledged that an individual cannot "improve" his or her 1-in-23,692-or-20,307 chance of winning the jackpot (even by agreeing with other players to play for the jackpot), but must "accept those as the odds approximately . . . [as] to how many hands on the average you'd have to play before you won a jackpot . . . [i]f you and all other players at the table decided that [you] wouldn't throw away a hand, no matter what."

By comparison, Caro estimated that the odds of winning the California lottery game of DECCO were similar, i.e., 1 in 28,560; he believed that the

frequency of the jackpot was less for 7-card stud and hold'em games than for lowball.

### 2. Dr. David Aldous (Aldous)

At his deposition the state's designated expert Aldous testified he is a professor of statistics at the University of California, Berkeley, where he teaches, among other things, mathematical probability theory; he received his B.A. in mathematics, and his Ph.D. in statistics from the University of Cambridge, England. Aldous has been an associate editor of many journals including the Annals of Probability, the Journal of Mathematical Analysis, the Journal of Theoretical Probability, and the Annals of Applied Probability. Among Aldous's numerous publications is *Shuffling Cards and Stopping Times*, a 1986 study which appeared in 93 Am.Math. Monthly 333-348 and which determined the minimum number of times necessary to shuffle a deck of cards for the cards to be randomly ordered.

Aldous reviewed Caro's statistical analysis with respect to stud jackpot poker and found it to be correct; he also performed his own computer statistical analysis of lowball jackpot poker to calculate the maximum chance of winning the jackpot.

Aldous's calculations set forth the maximum chances of winning lowball jackpot games "as *less than* one chance and [in] some number"—calculations which he likened to saying that a person is less than 15 feet tall, which is true but inaccurate. For example, Aldous calculated that in a lowball game with six players "the chance of any particular player [winning the jackpot according to the rules as played at the Oaks Club, and assuming 5,500,000 deals] . . . is *less than* 1 chance in 2,400 . . . regardless of the skills of the players involved." This figure assumes that the "optimal strategy" for obtaining a jackpot has been used by all participants, i.e. it assumes a "hypothetical[] person who is only interested in winning the jackpot," and as such it emphasizes, as did Mr. Caro's computer simulations, the "maximum chance, regardless of the skill of the player," of winning the jackpot. In reality, participants "play differently and end up with a smaller chance of [winning] the jackpot."

As Aldous further explained, the "actual chance of a jackpot being won and the actual frequency with which the jackpot is won is less than the number I calculated here because these calculations are what they would be if people were only looking at the jackpot, than looking at regular parts and bluffing and folding, and all those things that make it *less likely to actually win the Jackpot*" (italics added); Aldous further calculated that the chances

of someone at a six-person table winning the jackpot is less than one in four hundred. He emphasized that the "1 in 400 isn't saying . . . what the actual chances are but . . . [that] the actual chance is something *less than 1 in 400* . . . [and that] [w]hatever choices a player makes, the chances are less than the 1 in 400." (Italics added.)

Aldous read the deposition of the general manager of plaintiff Oaks Club, John Tibbetts, and found that the fact that the jackpot in the $4 lowball jackpot poker games offered at the Oaks Club is set at a minimum at $1,000 and capped at a maximum of $3,000 "corroborate[es] the point of view that . . . regardless of the skills of the players, the jackpot is actually won less often than 1 time in 1,000 [and] if it were more often than that, they couldn't keep the jackpot going"; Aldous also stated as follows: "[T]he most interesting figures in John Tibbetts' deposition is the fact that the amount of money paid out on jackpots—and this is the $4 lowball, the jackpot payments were capped between $1,000 and $3,000, and so the inference from that is that the actual chances of winning the jackpot or the actual . . . chances of the jackpot being [won] on a particular deal have to be something between 1 in 1,000 and 1 in 3,000 because otherwise the club is sort of treating the jackpot fund as the players' money and not the club's . . . . So there is good evidence from those actual figures of $1,000 and $3,000, and someone with good experience of jackpot poker or mathematical intuition of guessing probabilities, but the inference is that gamblers in the clubs who know the figures, as Mr. Tibbetts, believe that actually the jackpot is between one time in 1,000 and one time in 3,000, regardless of the skill of the players . . . ."[3]

Aldous then also calculated how many times players would have to play the game "in order for the more skillful player to have a pretty good chance to win more times than the less skillful player"; specifically, Aldous calculated "how long" a more skillful player would have to play before such a player would have a 90 percent chance of winning more jackpots than a less skillful or "typical" player; Aldous determined that it would take a "professional gambler, who might play 60,000 hands a year (50 weeks, times 40 hours a week, times 30 hands an hour)[,] . . . much of a lifetime [or 2,750,000 games] in order for his skill to manifest itself by winning extra jackpots."

---

[3]From his review of Mr. Tibbetts's deposition, Aldous determined that the average amount of Jackpot payoffs at plaintiff Oaks Club during the three-month period, January through March 1988, was $1,800.

Using the $1,800 average payoff figure from the Oaks, Aldous also explained, "If there are 6 players, then the chance of someone winning a jackpot—actual chances on the average of a typical player winning a jackpot is, roughly, 1 in 1,800 times 6, [or] roughly 1 in 10,000."

### 3. *Declaration and Deposition Testimony of Sergeant Gregory A. Chapin (Chapin)*

Chapin has been a member of the Los Angeles County Sheriff's Department for 22 years. At the time of the hearing, he had been assigned to the detective division, special investigations bureau, and was a supervisor dealing exclusively with illegal gaming and bookmaking activities within Los Angeles County. In his 12 years in this capacity, Chapin or the deputies under his supervision made over 4,000 arrests for violations of municipal code and state statutes covering all forms of illegal gaming and gambling activities.

Chapin has lectured at numerous police department seminars on illegal gambling. Specifically, Chapin is a state-credentialed teacher, and, over a 15-year period, has taught California Certified Police Officer Standard of Training classes concerning all aspects of gaming, and law enforcement. In addition he is a Federal Bureau of Investigation Gambling Technology graduate. He has lectured at the FBI (Federal Bureau of Investigation) academy in Quantico, Virginia and Washington, D.C. about gaming strategies, odds, probabilities, and about the enforcement of gaming statutes. He also has testified "in various civil and criminal trials as to gaming methodologies, theories, formats and structures." He has been recognized by municipal and superior courts as an expert in the field of gaming and gambling. Specifically, in his capacity as an expert witness he has testified about poker and games proscribed by Penal Code section 330.

During the past 37 years Chapin also has conducted hundreds of hours of research on all forms of gaming and gambling. During the past 25 years he has played all types of poker in gambling establishments in Los Angeles County. Moreover, in the past 10 years, he has played, on numerous occasions, the games of lowball draw poker, straight (high) draw poker, 7-card stud and Texas Hold'em at the following plaintiff Card Clubs: The California Commerce Club, the Bell Gardens Bicycle Club, and the Normandie Club. In addition, on numerous occasions he has participated in jackpot poker games at those Card Clubs. Chapin stated the jackpot awards at the Card Clubs are tacked onto the play of such games as lowball draw, straight draw poker, seven-card stud and Texas Hold'em.

In Chapin's opinion, it absolutely would be incorrect to assert that the play of jackpot poker requires as much or more skill as the play of the underlying poker games. This is because the jackpot award is *separate* from the actual contest called poker, and winning the jackpot award is not based upon *skill*.

Chapin explained that in jackpot poker, the illegal lottery is "piggy-backed" onto a legal poker game, and there are discernible differences between the poker game and the appended illegal lottery.

In Chapin's opinion, "The game of poker contains a mixed element of chance and skill." Sergeant Chapin stated that "round Games (gaming contests)" including poker involve many decisions and factors, such as knowledge, position, skill, probabilities/odds, and intuition of opponents' actions. These factors can be utilized to maximize one's potential to win at poker. Chapin further explained as follows: "[P]oker is unique in that the highest hand does not always win the general pot. In reality, bluffing and player manipulations are tangible assets which skillful players use to win the general pot with hands that are represented as high hands, but are really losing hands which are not 'called' by participating players . . . ." "Basically," said Chapin, poker is a "wagering situation. . . . It's guts, it's intuition. It's bravado."

In "regular" poker games, Chapin further explained the winners also are clearly defined at the *end of each hand*, the players win the amount placed in a common pot during the game; and winning is dependent upon both luck and skill; in contrast to poker, Chapin said the jackpot feature of a given poker game is separate and independent from the poker contest, and winning the jackpot is predominated by chance instead of skill, because the players winning the jackpot rely solely and exclusively upon "luck" or chance in being dealt or drawing the necessary cards to win the jackpot. Specifically, Chapin said, "Contained within the games of Texas Hold-Em, Seven-Card Stud, and Draw Poker, as played in at the plaintiff's card clubs, are bonus wagering pools referred to as 'jackpots.' The jackpot fund is derived from players contributions and it is a separate and independent fund or pool from the general pool (pot). The jackpot award can only be won by active or participating players who possess the second best hand at the same time that another player possesses the best or optimum hand. Thus, the person with the second-best hand would win the jackpot fund of money, but the person with the best hand wins the general betting pool (pot). In essence, when a jackpot is added to any poker game, the players are trying to win two (2) separate and independent pools of money."

Chapin further stated that to "assert that one player can orchestrate a hand or make another player (i.e. his opponent) go for the optimum hand so that the Jackpot can be won is not only incorrect, it is ludicrous"; in fact, Chapin pointed out that plaintiff Card Clubs "*nullify*" or "*void*" a win by any player who verbally or otherwise makes any overture concerning jackpot award

attempts. Accordingly, the jackpot circumstance occurs both rarely and with *no* knowledge or interaction between participants as to its possible occurrence.

In addition, Chapin pointed out that in contrast to the pot in the poker game, in a jackpot poker scheme, the additional cash prize (bonus) accumulates continuously until it is won; the award is won very infrequently; and winning the award is a *chance* occurrence which cannot take place unless the certain articulated factors—two rare hands achieved simultaneously—are in place.

Moreover, in the jackpot version, Chapin explained, "the game is dominated by chance instead of skill, due to the tremendous odds or probabilities [for example] against one player getting a 'wheel' at the same time that another player gets a 'Sixty-Four.'" "In jackpot games," Chapin said, "the plaintiffs set up an extremely rare combination of difficult to obtain poker hands that two or more players must obtain at the same time, in order to win the jackpot pool. Consequently, the Jackpot pools continue to grow to figures as high as $25,000 to $30,000 . . . because of the low probabilities and great element of chance that determines the winner. Similarly, just as a person has a low probability and unlikely chance of winning the state 6/49 lottery, a person has a low probability and little chance of winning the jackpot"; Chapin maintained, therefore, that the primary objective of experienced poker players who play in poker games such as draw lowball played at plaintiff Card Clubs, is to win the general pot, instead of the added "Jackpot" cash prize (i.e. fund of money), because of the high and tremendous odds against winning the "Jackpot"; in other words, stated Chapin, because the "jackpot feature does not itself involve any application of the player's skill," and "[w]inning the jackpot is an entirely fortuitous or random event over which a player has little, if any, control . . . players do not normally play with the immediate goal of winning the jackpot; they play to win the hand. If a player wins the jackpot, it is a welcome if solely chance bonus."

Furthermore, in Chapin's opinion, it is the chance, albeit remote, of winning the jackpot poker lottery award which lures players to the game; "The Jackpot award concept is very enticing to players and it is very popular," stated Chapin. "[T]he jackpot award pool continues to grow until two players possess the required optimum hands (i.e., a 'wheel' and a 'Sixty-Four') and win the jackpot prize. Hence, players put up *small considerations*, such as their ante and subsequent bets, in an attempt to win a large prize. The ratio of a large award for minor consideration that is found in

Jackpot Poker is significant because it is analogous to classic lottery schemes of having a remote chance to win large prizes for minimal consideration. As with lottery hysteria, as the jackpot award increases, so does the play or participation by gamblers. . . .”

Chapin, who has played in poker tournaments, and who considers himself to be a “fairly good” poker (not jackpot poker) player, and does “extremely well” when playing poker against average and weak players, stated at his deposition that he prefers to play poker at the jackpot table, even though his “thought is not [winning] the Jackpot.” Chapin explained as follows: “[T]heir strategy is to throw away at times winning hands to try and attain some almost unattainable situation. In my opinion, they are not really playing good poker. They are playing for some [prize] that is out there, that is very hard to attain. . . . And what they do individually doesn’t really help them win that. It has to be concurrence of hands and receivership situations that dictate whether or not they can even win a Jackpot. They can do everything in their power to do something with their hands, but without a [second] person, having an optimum situation, they cannot win that Jackpot.” Chapin said he “prefer[s] any game where I appear to have or feel like I have a better edge,” and that in jackpot poker games he believes he “can benefit greatly by the fact that [other] players are trying to reach . . . [the] almost . . . unattainable goal [of winning the Jackpot].”

In contrast Chapin said, “the thought pattern in my mind is that I’m trying to win the hand. The Jackpot is such an unreal expectation . . . that it doesn’t enter a whole lot, other than should I be fortunate to catch a certain card, and let’s say other players catch a certain card or cards, the Jackpot is somewhere out there . . . . My feeling is if the Jackpot comes—it’s kind of like the . . . California State Lottery. If it comes, it comes. There is not a whole lot I can do . . . . It just occurs. I . . . play the game to win the [poker common] pot.” “From a strategy standpoint, I . . . go to win the hand and if the Jackpot comes, the Jackpot comes,” he said.

Chapin explained why law enforcement is particularly concerned about jackpot games: “Law enforcement has been very concerned with the distribution of jackpot awards because jackpot pools are an ideal situation for ‘skimming’ of profits, since no outsider is privy to the exact amounts of jackpot monies collected from the players. The California Commerce Club and the Bell Gardens Bicycle Club collect the jackpot monies and disseminate these monies in varying percentages. Clubs take approximately 15-20 percent from the ‘jackpot’ for so-called ‘administrative fees’ which cover items such as costs of security, counting, cashiers and tournaments for

jackpot winners. The card clubs frequently reserve a percentage of the jackpot fund as a secondary jackpot pool, or they will use collected Jackpot monies to replenish house monies that are used to start a jackpot (i[.]e., know[n] as the *seed*)." (Italics in original.)

Chapin also read the declaration of plaintiffs' expert witness, I. Nelson Rose, and learned of plaintiffs' assertion based upon that declaration that "various forms of Jackpot Poker have been played in California for over 100 years." He disagreed with the assertion for several reasons, but primarily because Mr. Rose's predicate statement about the history of jackpot poker is inaccurate; Chapin explained that "Mr. Rose tries to draw a correlation to an 1880's Poker contest called 'Jackpots' or 'whangdoodle' as being analogous to the contested versions of Jackpot Poker, played in the plaintiff card clubs. This contention is absolutely erroneous, however, because Jackpot Poker has a variety of dissimilarities from the games that Mr. Rose describes. For example, the game(s) described by Mr. Rose is a *one winner* target/objective hand which wins a common pot that all players vie for, with no contribution to a secondary pot. In contrast, in Jackpot Poker there are *two winning* hands which must be possessed simultaneously by different players with consideration being paid for both a poker pot and a secondary lottery fund pool (cash Prize)."

In Chapin's opinion, "Jackpot Poker as played at plaintiff clubs is a relatively new phenomenon, which only has gained public popularity within the last eight to ten years"; Chapin stated that law enforcement authorities in the County of Los Angeles, including him, believe that the secondary (cash prize or jackpot) attached to otherwise legal poker games and approved in name by various city councils, are illegal lotteries in violation of Penal Code section 319; Chapin summarized his view as follows: "It must be emphasized that the jackpot variation of poker is distinct from the actual poker card play. Therefore, the jackpot concept is an illegality masked in the legal aspects of poker play. Winning the jackpot is merely a chance or random event over which a player has little, if any, control. Since winning a jackpot is merely a random or chance event, Jackpot Poker is a lottery that is prohibited by Penal Code section 319[.]"

Chapin concluded: the Card Clubs' contention "that 'jackpot' awards are legal because poker is legal, is a complete misconception of the differences between poker and a lottery. In essence, Jackpot Poker is merely a lottery that is disguised as a poker game."

### 4. *Deposition and Affidavit Testimony of I. Nelson Rose (Rose)*

Rose, a law professor at Whittier College School of Law in Los Angeles, who spends the majority of his time teaching, writing, and testifying about

"gambling law," testified that he was familiar with or observed the play of jackpot poker at all or most of the plaintiff Card Clubs. Rose also testified that although he had played jackpot poker "dozens of times," he had never won the jackpot. Rose also testified that he does not *"go very often"* to play poker, and admitted *"I'm not that good a player."* (Italics added.) Rose said his book, Gambling and the Law does not focus on jackpot poker, and that since the 1989 Attorney General's opinion he has not written an article focusing on jackpot poker.

Rose did not believe whether chance predominates over skill is "an issue in the question of whether the game is a lottery or not." But Rose stated anyway, in his opinion, "in the game of jackpot poker, the elements of skill predominate over chance in the game of jackpot poker." With respect to the skill involved in poker, Rose stated: "One of the things to understand is that poker is not just cards. In fact, a very good argument could be made that the cards are the less important element of the game of poker. Poker is a game of human psychology, and your goal is to find out what everybody is doing at the table . . . ." Rose also explained: "Poker is unique among all gambling games and most card games. There's very few other games that exist in the world where you can win by having a weaker hand and where a bluff is allowed. [¶] The bluff is the factor that is so unique to poker, that you are constantly trying to mislead your opponents." Rose further explained, in poker one "misleads" or "deceives" the other players, and that: "I mean the thing about poker is it's one of the only parts of life where what would be considered cheating is honorable and desirable. And if you are real good at it, you can succeed. You are supposed to lie and take people's money."

In Rose's opinion, "the jackpot feature in jackpot poker is an integral part of the game of poker. And the game of poker is I believe predominantly skill." Rose also opined that although it is against the rules for players to openly communicate, some subtle communication can occur. "[F]or example, if a particular player would bet the limit everytime he is going for the jackpot, that might be picked up by another player, in which case it would not be [illegal] under the rules of the game for those two players per se to play . . . 'together'[.]" In fact, Rose said, "[Y]ou would probably do that on purpose, assuming that you can put that message out and not drive people away. You want as many people around as possible to draw to get the . . . jackpot." Rose admitted, however, that each individual player is free to interpret any betting "message," and that is "actually the biggest problem with this. And the reason it doesn't work as well as it could is that since you are not allowed to verbally communicate it, your signs may be misconstrued."

The presence of the jackpot, according to Rose, is that it tends to keep more players in the game because "players who might otherwise fold will stay in and draw two, even three cards, which is not a good hand. You should not be drawing two or three cards because . . . some of the weaker players believe they can get the jackpot, and occasionally they do, but not enough to make it statistically significant that it was a right decision."

Rose, who attended Chapin's deposition, acknowledged that Chapin played jackpot poker with this in mind, and commented upon Chapin's testimony as follows: "As a skillful player, he knows the less skillful players will be busy trying to get this jackpot. And so he's going to be playing conservatively and using his skill to win [the common pot]." Rose thought that Chapin's strategy was a "reasonable" one, and opined that Chapin seemed to be "a very skillful player."

Rose conceded that Caro's 1-in-23,692 chance of winning the jackpot is not a "real world situation" because it assumes the "Jackpot feature is all that you are playing for," and in reality players play for the pot as opposed to the jackpot. Rose opined that if players at a card club who had equal stakes to begin with played jackpot poker for five hours, at the end of the evening "the more skillful players in general would have more money," not just because of their winnings, but also because they were able to "cut their losses." Rose also "guessed" that in that same five-hour period, a jackpot would not be hit, because "they don't come up often enough." Furthermore, in Rose's opinion, "it's irrelevant whether [jackpot poker is a game of] predominantly skill," because "[e]ven assuming that it is predominantly chance, it is still a form of gaming and, if outlawed, would be outlawed under the gaming sections of Penal Code 330, not under the lottery sections."

Specifically, Rose explained that based upon his reading of the "constitutional debates," edited by "a guy named Brown," jackpot poker is not a lottery, because in "1849 or 1850" when the "prohibition on lotteries was added to the California Constitution . . . they clearly did not mean gaming, games of chance where you had to go someplace and play." In addition, Rose stated, even today, the lottery prohibition does not "mean gaming such as poker, games of chance *where you go to a place to play*." (Italics added.)

In his affidavit testimony, Rose also explained this in part as follows: "A major difference between a lottery and poker is the requirement in the card game that the player remain physically present to play and win. With a lottery or similar scheme a player can buy a ticket and leave, the drawing

will take place whether or not any individual ticket holder is present. A card game requires that the player participate in all stages of the game; there can be no play or outcome without the active participation of the players." Rose further explained the basis for his opinion, in part as follows: "Gaming and lotteries each create social problems that are unique to that particular form of gambling. Since gaming requires a special place for the games to be played, it has been a recurrent worry that working men will abandon their jobs, leaving their place of employment during working hours, to gamble. This problem is most acute with casino gaming. In casino games the gambler plays against the house, which has the odds in its favor and inevitably draws in large amounts of money at the expense of the players. In contrast, in round games, such as poker, the gamblers play against each other. Money is lost to other players, not to the house, and remains in the community. [¶] Lotteries create a different type of problem, which in many cases has a much greater negative impact on the general society. Where only a few men could go to a gaming hall at any one time, lottery tickets can be sold virtually everywhere. This distinction was recognized by the United States Supreme Court [in *Stone* v. *Mississippi* (1879) 101 U.S. 814 (11 Otto) 814 (25 L.Ed. 1079)]: 'Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the wide-spread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community . . . .' " Rose also noted in his affidavit that "[t]he English rule, the 'pure chance' doctrine, states that a lottery involves pure chance and that any element of skill will take the game out of the prohibition on lotteries."

Rose further said at his deposition, "Penal Code 319 the prohibition of state lotteries does not prohibit games. It prohibits schemes, while Penal Code 330 talks about games." Rose also said, "[even though] nobody before has ever said this," jackpot poker "came in really big in the 1880's and 1890's"—subsequent to the enactment of the California Constitution—and "yet nobody ever raised that [i.e. jackpot poker is an illegal lottery] . . . when they tried to outlaw a card room or even the industry."

### 5. *Declaration Testimony of Michael D. Broderick (Broderick)*

During the period between April 1984 and November 1989, Broderick served as staff and later as manager of the California Department of Justice's gaming registration program. Within this period, he also served as staff to Mr. G.W. Clemons in his capacity as chairman of the California Peace Officers' Association (CPOA) Gambling Committee. In 1989, Broderick was named as a defendant in the action Tibbetts v. Van de Kamp, *supra*, one of the cases in this coordinated action.

During the time Broderick was affiliated with the state's gaming registration program, numerous attempts were made to work with California's gaming industry in an attempt to develop replacement legislation to Penal Code section 330 which would provide the clarification and controls needed in order to more effectively regulate gambling activities in California.

Broderick in his declaration responded to and refuted the March 22, 1990, declaration of Mr. Rodney J. Blonien, which was relied upon by plaintiffs in this action. Mr. Blonien's points are as follows: (a) Mr. G.W. Clemons, in his role as chairman of the CPOA Gambling Committee was also acting as the formal representative for the California Department of Justice in his role as Director of the Division of Law Enforcement; and (b) the CPOA Gambling Committee supported amendments to Penal Code section 330 which would have included "Jackpot poker" among the games specifically permitted to be placed in California card clubs.

(a) *Official Status of Mr. G.W. Clemons (Clemons)*

With respect to Clemons's status, Broderick stated as follows: "In his role as Chairman of the CPOA Gambling Committee and its legislative subcommittee, Mr. G.W. Clemons served in that role solely as a CPOA member and not representing either the Department of Justice and/or the California Attorney General in any capacity. Official correspondence directed to the gaming industry in this capacity was primarily on CPOA letterhead identifying Mr. Clemons in his signature block as Chairman of the CPOA Gambling Committee. Mr. Clemons' detachment from the Department of Justice is evidenced by an internal memorandum from Mr. Clemons to Attorney General John Van de Kamp dated May 19, 1987 which, in paragraph 2, Mr. Clemons states that 'as Chair of the CPOA Gambling Committee, I made it very clear to CPOA that I was supporting the bill as a CPOA member and not representing the Department of Justice nor committing you (Attorney General) to support the bill.' A true and correct copy of the relevant portions of the May 19, 1987 Memorandum is attached hereto as *Exhibit 1*."

Moreover, Broderick made clear that during his assignment with the Department of Justice's gaming registration program, Clemons was emphatic in making sure that both Broderick's predecessor (James M. Watson) and Broderick understood the distinction between his role as a CPOA member as it related to his involvement in Penal Code section 330 negotiations as distinguished from his role as their supervisor of the department's gaming registration program and his role as Director of the Division of Law Enforcement.

### (b) *CPOA and "Jackpot Poker" Legislation*

Broderick opined that Mr. Blonien's statement that the CPOA Gambling Committee supported amendments to Penal Code section 330 including a provision which would have authorized the playing of "Jackpot poker," is "misleading." Broderick explained the genesis of the gambling legislation as follows:

"During the period of 1986 through 1989, the CPOA Gambling Committee participated in an attempt to redraft [Penal Code section] 330 to clarify how designated games could be played in California. Specifically, during 1986 and 1987, two pieces of legislation were introduced in subsequent legislative years in an attempt to improve California's gaming statute. Senate Bills 2281 and 861 (authored by Senator Campbell) provided the vehicles through which negotiations took place between the California Peace Officers' Association and California's gaming industry . . . .

". . . [A]s the CPOA Gambling Committee became better educated throughout the negotiations as to the subject matter with which they were dealing, it eventually became evident that clear conflicts existed between any legislative proposal which might authorize the playing of 'jackpot poker' and constitutional and statutory prohibitions against illegal lotteries.

"This was coupled with specific law enforcement concerns as to the possible inherent criminal nature of 'jackpot poker' which led the CPOA Gambling Committee to specifically *prohibit the inclusion of any language authorizing the playing of 'jackpot poker'* in legislative proposals that were developed during 1988 and 1989.

"In fact, subsequent legislative attempts to revise [Penal Code section] 330 specifically contained the sentence, '*The playing of jackpot poker as defined is prohibited.*' Such a position was no more clearly evident than in the CPOA Gambling Committee's recommendation to the Association's legislative advocate (Al Cooper) in April of 1989.

"In examining a bill proposed by Senator Beverly (SB 973) which generally used, as its base, language that was developed in past years' negotiations between the gaming industry and the CPOA Gambling Committee, Mr. Clemons clearly indicated that the CPOA Gambling Committee was opposed to SB 973 primarily because of the unacceptable 'jackpot poker' provision. The CPOA Gambling Committee was in agreement with the Attorney

General's analysis of the bill which I prepared. (See Bill analysis, attached hereto as *Exhibit 2*.)

"My analysis stated that despite controlling language contained in the proposed bill which would require its authorization by local ordinance and impose requirements documenting the distribution of these 'jackpot poker' funds, California's law enforcement community was adamantly opposed to allowing any form of this scheme to be carried out in California's gaming clubs. While 'jackpot poker' was currently being conducted under questionable legality in selected cardrooms throughout the state, there was deep concern voiced by California's law enforcement community and shared by the Attorney General's Office that 'jackpot poker' represents nothing more than an illegal 'lottery.' As such, the legislation of such activities was not possible through the legislative process due to constitutional prohibitions preventing the Legislature from authorizing lotteries." (Italics in original.)

Broderick also stated as follows with respect to the reasons that law enforcement finds jackpot poker undesirable: "In addition, state and local law enforcement agencies had been continually plagued with complaints surrounding the illegal skimming of such monies, the possible use of 'jackpot poker' for illegal money laundering purposes, and consumer fraud being carried out by the clubs relative to the improper distribution of these large 'jackpot poker' awards to individuals with whom they may have been in collusion. Quite candidly, inasmuch as these 'jackpot poker' awards could run into the tens of thousands of dollars, they served as an attractive item for possible abuse."

## III

### DISCUSSION

*The Trial Court Erred as a Matter of Law in Restrictively Interpreting the State's Lottery Statute and Determining That the Statute Permits Card Clubs to Offer a "Jackpot Feature" in Conjunction With Their Poker Games*

In this case, the trial court was presented with the question of whether the jackpot feature appended to lawful poker games is an illegal

lottery under Penal Code section 319,[4] and California Constitution, article IV, section 19.[5]

After a hearing, the court erroneously determined that "jackpot poker is not a lottery."

After a hearing, the court rejected the State's position based upon the 1989 Attorney General's opinion,[6] and supported by the record that jackpot games constitute a lottery as defined by California law because the games have all the features of a lottery: a prize, distributed primarily by chance, and consideration. (See 72 Ops.Cal.Atty.Gen., *supra*, 143; Pen. Code, § 319 et seq.; Cal. Const., art. IV, § 19; *Cal. Gas. Retailers* v. *Regal Petroleum Corp.* (1958) 50 Cal.2d 844, 851 [330 P.2d 778].)

In spite of contrary evidence, the trial court decided that jackpot poker "requir[es] a comparable level of skill to poker, and therefore [is] lawful on a local option basis . . . ."

In support of its conclusion, the court relied upon the following observations:

(1) "Plaintiff's expert, Rose, *a skilled poker player*, declared, in summary, after a discussion of the differences between poker and a lottery, that 'jackpot poker . . . is not a lottery' ";

---

[4]Penal Code section 319 provides as follows: "LOTTERY DEFINED. A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, *whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known.*" (Italics added.)

[5]California Constitution, article IV, section 19 provides: "(a) *The Legislature has no power to authorize lotteries* and shall prohibit the sale of lottery tickets in the State. . . ." (Italics added.) (California Constitution, article IV, section 19, subdivisions (b) through (e) list exceptions to otherwise illegal gambling activities. Penal Code section 319 defines a lottery, which Penal Code section 320 makes a misdemeanor to set up.)

[6]There are no reported California cases on the issue of whether jackpot poker is an illegal lottery. The only opinion on the subject is the 1989 Attorney General's opinion, 72 Ops.Cal.Atty.Gen. 143 (1989).

In *Lute* v. *Governing Board* (1988) 202 Cal.App.3d 1177, 1182 [249 Cal.Rptr. 161], the court held that in the absence of case authority, opinions of the Attorney General should be given great weight and are persuasive in the absence of controlling authority. (See also *Joiner* v. *City of Sebastopol* (1981) 125 Cal.App.3d 799, 804-805 [178 Cal.Rptr. 299].)

This court recognizes that the state has emphasized that the Attorney General's opinion concluded only that the "jackpot" element of jackpot poker was illegal and that poker, itself, may be legally played at plaintiffs' cardrooms in its many forms, including lowball and draw poker games without the jackpot.

(2) "Plaintiff's expert Caro also declared, in summary, that notwithstanding the small chance to win the jackpot, *the skilled player has a better chance to win—to make a profit at poker—than the unskilled player*";

(3) The state's expert Chapin "indicates that he believes, as a poker player, that *jackpot poker* involves *a significant amount of skill*," and he specifically stated a "preference . . . to play jackpot type poker," because he believed it is a "game where [he] can control [his] own destiny";

(4) "The essence of a lottery is *pure chance* i[n] which the participant exercises no skill and has no control over the outcome . . . .";

(5) "Accepting that the odds of winning the jackpot are very small, less than or comparable to winning the California State Lottery, the *odds of winning the jackpot are not relevant to a determination whether jackpot poker is a lottery or a lawful form of poker, that is, predominantly a game of chance or skill.* The astronomical odds involved in achieving certain hands in ordinary poker—for example, the odds of filling a flush or an inside straight with three cards to make a royal flush—do not affect the undisputed fact that ordinary poker is lawful";

(6) "Defendants offer no explanation why the fact that a player *tries to obtain the second-best required hand to win the jackpot eliminates the elements of skill in trying to achieve the best hand.* That a player's decision[s] are far more complex does not undermine the element of skill in deciding whether to play at all, and if so, whether to play for the pot awarded to the best hand or for the jackpot awarded to the second-best hand. For example, a player who draws the best-possible hand in poker is entitled to throw away a card and draw a card that hopefully will constitute the second best hand. That player is exercising no more or less skill than the player who draws a fairly low-ball and attempts to achieve the best hand by throwing away one or more cards and drawing other cards." (Italics added.)

It is clear, however, that the trial court erred *as a matter of law* in restrictively interpreting the state's lottery statute, and determining that the statute permits card clubs to offer an illegal Jackpot feature as an adjunct to its legal poker games.

The interpretation and construction of a statute such as Penal Code section 319, and its applicability to a given situation, are questions of law for the reviewing court. (See, e.g., *Killian* v. *San Francisco* (1978) 77 Cal.App.3d 1, 7 [143 Cal.Rptr. 430]; *In re M.L.B.* (1980) 110 Cal.App.3d 501, 503 [168 Cal.Rptr. 57]; *People* v. *Carroll* (1889) 80 Cal. 153, 157 [22 P. 129]

[definition of banking game a question of law]; *Sullivan* v. *Fox* (1987) 189 Cal.App.3d 673, 678 [235 Cal.Rptr. 5] [whether pai gow is percentage of banking game is legal issue to be determined by the appellate court]; *People* v. *Ambrose* (1953) 122 Cal.App.2d Supp. 966, 969-970 [265 P.2d 191]; *Estate of Madison* (1945) 26 Cal.2d 453, 456-457 [159 P.2d 630]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 241-242, pp. 246-249.)

### A. *California Law Does Not Permit Plaintiffs to Append an Illegal Jackpot Feature to a Lawful Game and Thus Circumvent California Lottery Law*

The Card Clubs alleged, and the trial court agreed, that the jackpot feature could not be separated from the underlying poker game and that the jackpot feature was an integral part of the legal poker game.

The trial court erred, however, in failing to recognize that just because poker itself is legal, this fact does not make the jackpot variation of poker legal, as well.

The question in this case is not whether the slim possibility of winning the jackpot money prize *transforms* the legal game of poker into an illegal lottery.

The question is whether the jackpot feature *itself* is an illegal lottery as defined by Penal Code section 319 and should be disallowed as an attempt to disguise an illegal game within a legal one.

Indeed, the only source for the conclusion that the games are inseparable is the inadmissible opinion testimony of a law professor, Rose, who, despite the trial court's characterization of him as a *"skilled poker player,"* admittedly does not play much poker.[7]

Based upon the law, as well as a careful and complete reading of the record, it is clear that the jackpot feature and the underlying poker games are completely severable, and that jackpot is an illegal lottery.

In "regular" poker games, the winners are clearly defined at the *end of each hand*, the players win the amount placed in a common pot during the game; and winning is dependent upon both luck and skill.

---

[7]Despite the trial court's reliance upon Rose as a "skilled" poker player, Rose admitted in his deposition testimony that he was far from a skilled player.

"Q [by Deputy Attorney General Borjon]: So you have played [poker] dozens of times?

"A [by Rose]: Not that many dozens because I won't go very often. I'm not that good a player. . . .

"Q: But you do not consider yourself that good of a player?

"A: No, I don't."

As the state's well-qualified expert, Chapin, explained, in jackpot poker the illegal lottery is "piggy-backed" onto a legal poker game as a chance bonus that, unlike poker, does not predominantly implicate a player's skill. The jackpot is not integral to the game of poker. Poker exists without it. The jackpot is simply a fortuitous and infrequent windfall that a poker player hopes for, but for which no poker player reasonably plays.

Nothing in California law permits the Card Clubs to append an illegal lottery onto a legal game and yet be allowed to operate the illegal lottery. As the California Supreme Court observed in *Cal. Gas. Retailers* v. *Regal Petroleum Corp., supra,* 50 Cal.2d 844, 859, the court will inquire, not into the name of the game but into the nature of the game itself, however skillfully disguised, in order to ascertain if it is a prohibited lottery.

As a matter of law there is not "any particular method of operation [which is] indispensable to the existence of a lottery." (See Pickett, *Contests and the Lottery Laws* (1932) 45 Harv. L.Rev. 1196, 1198-1201.) Rather, as the decisions of the California courts have made clear, the particular aspects of any lottery scheme are irrelevant, as long as the elements of a lottery, i.e., a prize, distributed primarily by chance, and consideration are present. (See, e.g., *Cal. Gas. Retailers* v. *Regal Petroleum Corp., supra,* 50 Cal.2d 844, 859; *Finster* v. *Keller* (1971) 18 Cal.App.3d 836, 842 [96 Cal.Rptr. 241]; *People* v. *Shira* (1976) 62 Cal.App.3d 442, 461 [133 Cal.Rptr. 94]; 54 C.J.S., Lotteries, § 7, p. 489 ["A scheme, no matter how disguised or named, is a lottery if in its character and practical operation it embodies the essential elements of a lottery."]; see also cases described in 71 Ops.Cal.Atty.Gen., 139, 140-142, 148-153 (1988).)

In *Finster* v. *Keller, supra,* 18 Cal.App.3d 836, 842, the court specifically rejected the assertion that the state Constitution's lottery prohibition was "narrowly directed at what may be called the classical lottery" and found that the "present constitutional provision [adopted in 1966], equally with the earlier [1879] provision is directed at *any scheme by whatever name it might be called* that falls within the meaning of lottery in common usage." (Italics added.) (See also *In re Hubbard* (1964) 62 Cal.2d 119, 125 [41 Cal.Rptr. 393, 396 P.2d 809] [The legislature certainly intended to prohibit "all forms of lottery."].)

The diversity of contests and games found by the California courts to be lotteries, from "Ringo" (*People* v. *Shira, supra,* 62 Cal.App.3d at p. 461) to "5-10 pools" (*Finster* v. *Keller, supra,* 18 Cal.App.3d at p. 842 [picking winners of five successive horse races] to theater "cash night" drawings

(*People* v. *Gonzales* (1944) 62 Cal.App.2d 274, 277 [144 P.2d 605]) and "suit club plans"(*People* v. *Hecht* (1931) 119 Cal.App.Supp. 778, 784-787 [3 P.2d 399]) dispels the notion that in California, the Legislature intended to prohibit only certain types of lotteries.[8]

As Chapin explained: "It must be emphasized that the jackpot variation of poker is distinct from the actual poker card play. . . . The [Card Clubs'] contention that 'jackpot' awards are legal because poker is legal, is a complete misconception of the differences between poker and a lottery. In essence, Jackpot Poker is merely a lottery that is disguised as a poker game.' "

Courts have seen through other attempts by enterprising parties to portray or disguise a lottery as part of an otherwise lawful game, or endeavor. For example, in *People* v. *Shira, supra,* 62 Cal.App.3d at pages 460-461, the Ringo game at issue was found to be a lottery, even though the plaintiffs had appended contests of skill to the game format.[9]

Likewise, in *In re Interrogatories of Governor, etc.* (1978) 196 Colo. 353 [585 P.2d 595, 598], the Court observed as follows: "Game A begins with a race in which players predict which animals will win, place, or show in a particular race. Winning players are [then] entitled to participate in a later

[8]It is a cardinal principle of judicial review and interpretation that unambiguous statutes and constitutional provisions are not subject to interpretation and construction. (See *People* v. *Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288].)

By its terms, article IV, section 19 of the California Constitution provides that "The Legislature has *no power to authorize lotteries*" and broadly and clearly outlaws lotteries except for the California State Lottery, and bingo *games* played for charitable purposes. The fact that the *Constitution* provides that "bingo games . . . for charitable purposes" is an *exception* to the blanket prohibition on lotteries, itself, also shows the state's intention to broadly construe lotteries to include games beyond large-scale "ticket" lotteries.

Moreover, if the Legislature had wished to exempt certain kinds of "games" from the state's prohibition, "it would have been very simple to say just that." (See *In re Hubbard, supra,* 62 Cal.2d at pp. 119, 126.) The Legislature chose no such wording, and as set forth above, the case law supports no such exemption.

Indeed, the Constitution's broad prohibition on all lotteries is repeated in Penal Code section 319, which explicitly condemns "any scheme" with the elements of a lottery.

Where, as here, the language of the Constitution, and the companion statute is clear, it is controlling, and the principles of construction (such as resort to historical analysis) designed to clear up ambiguous laws, are inapplicable. (*People* v. *Stanley* (1924) 193 Cal. 428, 431 [225 P. 1].)

[9]Ringo is a game similar to bingo except that players who succeed in tossing a small ring over a peg are given free bingo cards (approximately 12 percent), while the others (approximately 88 percent) pay for the cards and a chance at the prize. A winner at the ensuing bingo game must then throw at least one of three larger rings over a thick peg in order to win the cash prize. (*People* v. *Shira, supra,* 62 Cal.App.3d at p. 452.)

drawing for a money prize. The second phase of Game A is encompassed by the constitutional prohibition on [lotteries]." (Cf. *Helen Ardelle Inc.* v. *Federal Trade Commission* (9th Cir. 1939) 101 F.2d 718, 719 [candy sold to the public by means of a punchboard is a lottery].)

### B. *The Component Elements of the Jackpot Award Demonstrate That It Is an Illegal Lottery as Defined by Penal Code Section 319*

Poker games and lotteries such as the jackpot feature appended to a poker game are readily distinguished by their component elements.[10] There are discernable differences between the poker game and the appended illegal lottery.

Unlike the underlying poker game, the jackpot feature appended to the poker game has all of the elements of a lottery.

### 1. *The Rules of Jackpot Poker That Determine the Distribution of the Jackpot Prize Are Separate and Distinct From the Rules of Poker That Determine the Distribution of the Pot in "Regular" Poker Games*

Importantly, the rules of jackpot poker that determine the distribution of the jackpot prize are separate and distinct from the rules of poker that determine the distribution of the pot in the poker game.

In all jackpot poker games played at plaintiff Card Clubs, there is a cash prize designated as the jackpot which is separate from the prize designated as the pot.

Wagering activity is integral to the game of poker because the wagers within a game constitute the pot which may be won by any participant. (See *People* v. *Beatty* (1860) 14 Cal. 566, 568-569 [Gaming is " 'a contract between two or more persons, by which they agree to play, by certain rules, at cards, dice, or other contrivances, and *one shall be the loser and the other the winner.*' " (Italics added.); see also *People* v. *Postma* (1945) 69 Cal.App.2d Supp. 814, 818 [160 P.2d 221]; *People* v. *Oreck* (1946) 74 Cal.App.2d 215, 220 [168 P.2d 186].)

In contrast, the jackpot game has a true "prize," which is a separate fund that accumulates from game to game and is paid by the disinterested lottery operator, i.e., the card club, to the winner.

---

[10]Pleadings filed during the course of this litigation established that the Card Clubs do not dispute that their jackpot games contain the "prize and consideration," elements of a lottery.

In their final pleadings, the Card Clubs stated as follows: "Plaintiffs have no quarrel with respect to the existence of the first two elements—prize and consideration. Both elements are normally present in the games played at the CLUBS."

The Card Clubs do dispute, however, "chance predominates over skill in Jackpot poker."

The wagers which form the "pot" in poker do not constitute a "prize" as defined by California law.

The court has explained the difference between wagers in games and prizes given in lotteries as follows: " 'A bet or wager is ordinarily an agreement between two or more that a sum of money or some valuable thing, in contributing which all agreeing to take part, shall become the property of one or some of them, on the happening in the future of an event at the present uncertain; and the stake is the money or thing thus put upon the chance. There is in that this element that does not enter into a modern purse, prize, or premium, viz., that each party to the former [viz., the wager] gets a chance of gain from others, and takes a risk of loss of his own to them. . . . [In contrast a] purse, prize, or premium is ordinarily some valuable thing offered by a person for the doing of something by others, into the strife for which he does not enter. He has not a chance of gaining the thing offered; and, if he abide by his offer, that he must lose it, and give it over to some of those contending for it, is reasonably certain.' " (*Hankins* v. *Ottinger* (1896) 115 Cal. 454, 458 [47 P. 254] quoting *Harris* v. *White* (1880) 81 N.Y. 532.)

For these reasons, the jackpot prize is legally distinguishable from the pot won in "regular" poker.

In short, the jackpot prize is a sum of money far in excess of the wagers made at the table which are sums of money passed between the direct table participants of the game. Unlike the pot distributed in each "regular" poker game, in jackpots, the distribution of the prize by the lottery operator depends *solely* upon the fortuity or random event of one person having the second best hand and another person having the game's best hand at the same time.

This distinction is one which highlights the separation between the games.

### 2. Chance Dominates Over Skill in Determining Who Wins the Jackpot in All Forms of Jackpot Poker Games

Likewise, the trial court erred in failing to recognize that winning at poker games and winning the jackpot are readily distinguished by the element chance plays in winning the games, and that under California law a game need not be one of "pure chance" to be a lottery.

In determining whether a particular game or scheme is a lottery, the test in California is whether the game is *dominated* by chance, not whether

the winner of the game is determined *solely* by chance. (*In re Allen* (1962) 59 Cal.2d 5, 6 [377 P.2d 280, 97 A.L.R.3d 1415], citing *People* v. *Settles* (1938) 29 Cal.App.2d Supp. 781 [78 P.2d 274];[11] see also *In re Hubbard, supra,* 62 Cal.2d at p. 122; *Finster* v. *Keller, supra,* 18 Cal.App.3d at p. 841 [noting the different odds of winning a lottery game by skilled and unskilled bettors]; *People* v. *Shira, supra,* 62 Cal.App.3d at pp. 462-463; *Einzig* v. *Police Commissioners* (1943) 138 Cal.App. 664, 666-667 [32 P.2d 1103] ["skill-ball" game of mixed chance and skill was an illegal lottery].)

The "domination" standard is a well-settled test in California. The plaintiffs in this case are mistaken and the trial court is in error by adhering to the proposition that lotteries are distinguishable from games because lotteries, by definition, involve *no skill whatsoever.* (See also 54 C.J.S., Lotteries, § 4, pp. 486-487 [noting general proposition that "the mere fact that some skill is involved in the game is insufficient to save it from being a lottery."].) The trial court therefore erred when it found: "The essence of a lottery is *pure chance* in which the participant exercises no skill and has no control over the outcome of the lottery."

Moreover, the testimony unequivocally showed that winning the jackpot, unlike winning the poker pot, *is based predominately on chance not skill.* The trial court's finding to the contrary, based upon law professor Rose, is completely undermined by the testimony of all other witnesses—particularly the expert poker players such as plaintiffs' Caro, who has been called "the finest draw [poker] player alive"[12] and Chapin, who has played competitive poker for many years, and whom Rose acknowledged to be a skilled poker player.[13]

"In jackpot games," as Chapin explained, "the plaintiff[s] set up an extremely rare combination of difficult to obtain poker hands that two or

---

[11]In *In re Allen, supra,* 59 Cal.2d 5, 6 the California Supreme Court articulated the test for determining whether a game is one of chance or skill, as follows: "It is the character of the game rather than a particular player's skill or lack of it that determines whether the game is one of chance or skill. The test is not whether the grame contains an element of chance or an element of skill but which of them is the dominating factor in determining the result of the game."

[12]Caro's biography states that "Twice world champion Doyle Brunson [has] call[ed] [Mr. Caro] 'the finest draw player alive.'" The document also sets forth that "Noted gambling authority David Sklansky rated Caro #1 on his list of top living draw poker players. Authority John Scarne, in his book *Scarne's Guide to Modern Poker,* calls Caro one of the five best draw players in the world today."

[13]At his deposition, Rose admitted he was not a skilled poker player, but that Chapin is a skilled player.

Rose, who attended Chapin's deposition, commented upon Chapin's testimony in part as follows: "As a skillful player, he [Sergeant Chapin] knows the less skillful players will be busy trying to get this jackpot. And so he's going to be playing conservatively and using his

more players must obtain at the same time, in order to win the Jackpot pool." One player must get the best hand, e.g., a "wheel" (5-4-3-2-1) at the same time that another player gets the second best hand, e.g. a "Sixty-Four" (6-4-3-2-1). The participants in jackpot games are thus engaged in a kind of "reverse lottery" where the winning "numbers" are known ahead of time, but two players must concurrently pick them from a deck of cards.

Despite the findings of the trial court, the testimony showed that none of the "skill" used in regular poker comes into play to win the jackpot. The "decision" to "throw away" a card and "hope" for a different one, is not what the poker experts regard as the "skill" involved in regular poker.

Rather, both Chapin and Rose indicated that it is personal "assets" such as "bluffing and player manipulations" that players use to win the pot with "hands that are represented as high hands, but are really losing hands which are not 'called' by participating players . . ." that represent the "real skill" in poker games.

"In fact," stated Rose, "a very good argument could be made that the cards are the less important element of the game of poker. Poker is a game of human psychology . . . ."

As Rose further explained, "There's very few other games that exist in the world where you can win by having a weaker hand and where a bluff is allowed. The bluff is the factor that is so unique to poker, that you are constantly trying to mislead your opponents . . . . [Poker] is . . . one of the only parts of life where what would be considered cheating is honorable and desirable. And if you are real good at it, you can succeed." "Basically," as Sergeant Chapin said, poker is a "wagering situation . . . It's guts, it's intuition. It's bravado."

Chapin's testimony also made clear that one cannot apply any of these true poker "skills" to win the jackpot prize, because all the bluffing and bravado in the world cannot deposit the required cards in one's hand. In addition, as Chapin explained, to "assert that one player can orchestrate a hand or make another player (i.e. his opponent) go for the optimum hand so that the Jackpot can be won is not only incorrect, it is ludicrous." In fact, Chapin pointed out that plaintiff Card Clubs *"nullify"* or *"void"* a win by any player who verbally or otherwise makes any overture concerning jackpot

---

skill to win [the common pot.]" Rose thought that Chapin's strategy was a "reasonable" one, and opined that Chapin seemed to be "a very skillful player."

award attempts.[14] Accordingly, the jackpot circumstance occurs both rarely and with *no* actual knowledge or interaction between participants as to its possible occurrence.

Likewise, the Card Clubs acknowledged that in all forms of jackpot poker played at their clubs, individual players have no control over what particular card value (e.g., ace, two, three, etc.) will be dealt to them or dealt to other players because the order of the cards in the deck which is dealt is random and unknown to the participating players.

The trial court also apparently misunderstood the import of the testimony when it broadly observed in support of its conclusion that jackpot poker is a game comparable to poker in terms of skill, that "the skilled player has a better chance to . . . make a profit at poker—than the unskilled player."

In fact, the testimony showed that skilled poker players do not play to win the jackpot prize offered in conjunction with regular poker games due to the fact that luck, not skill, determines the jackpot winner. As Chapin explained, because the "Jackpot feature does not itself involve any application of the player's skill [and] "[winning] the jackpot is an entirely fortuitous or random event over which a player has little, if any, control . . . players do not normally play with the immediate goal of winning the jackpot; they play to win the hand. If a player wins the jackpot, it is a welcome if solely chance bonus."[15]

As a testament to this fact, Caro, one of the most skilled poker players in the world, estimated that he personally had played about 4,000 hands of jackpot poker, but had won the jackpot only once. Caro also explained that the one time he won the jackpot, he "wasn't paying any attention to the game," and that he "was probably displaying *no skill*" at the time.

Indeed, in Caro's opinion, the presence of more skillful players at a table "*decreases* the likelihood of a Jackpot being hit." (Italics added).

---

[14]To the extent that a player could try to drop a "legitimate" hint to the others through his betting pattern that he has a good hand, even Rose admitted the "signal may be misconstrued."

[15]Likewise, the trial court apparently misunderstood the deposition testimony of Chapin to support its apparent conclusion (borrowed from plaintiffs' trial brief), that "[a]s in any poker game, the skilled players are the ones who win the most money in Jackpot Poker." Chapin's testimony established only that skilled poker players can win more money in the legal and underlying *poker game* by taking advantage of unskilled players who stay in the game too long because they foolishly hope to win the jackpot. As Chapin's declaration testimony made clear, winning the underlying poker game at the conclusion of each hand based upon skill is different from winning the separate jackpot which constantly accumulates from game to game, and represents a distinct and severable feature which is appended to a poker game, and which is won by a chance occurrence.

Likewise, the Card Clubs themselves acknowledged during discovery that the unskilled player who chooses to play each hand to its completion would, over a long period of time (assuming the availability of sufficient money to fund that strategy), probably win more jackpots than a skilled player playing the same number of hands.

In short, the testimony showed that even without factoring in the dismal odds of winning the jackpot, it is clear that the jackpot variation of poker can only be classified as a game of chance because the winner of the jackpot has no control over the person who must obtain the "wheel," cannot realistically predict when another player will have "a wheel," and uses no skill to help someone else get a "wheel."

Therefore, the trial court fundamentally misunderstood the impact of the testimony when it concluded that there was "skill" in jackpot poker because "a player who draws the best-possible hand in poker is entitled to throw away a card and draw a card that hopefully will constitute the second best hand," and that such player is "exercising no more or less skill than the player who draws a fair low-ball hand and attempts to achieve the best hand by throwing away one or more cards and drawing other cards." The trial court simply misidentified the "skill" elements of poker in finding that there is a comparable level of skill in regular and jackpot poker.

Moreover, despite the trial court's conclusion otherwise, "the high and tremendous odds against winning the 'jackpot,' " are indeed "relevant to a determination whether jackpot poker is . . . predominately a game of chance or skill." The court's stated reason for its assessment that "the odds of winning the jackpot are not relevant to a determination whether Jackpot poker is a lottery or a lawful form of poker," again evidences its failure to comprehend the differences between regular poker and the jackpot feature appended to it.

Although as the trial court stated: "The astronomical odds involved in achieving certain hands in ordinary poker—for example, the odds of filling a flush or an inside straight with three cards to make a royal flush—do not affect the undisputed fact that ordinary poker is lawful," this "fact" is immaterial as applied to winning the jackpot. In "regular" poker *one does not have to achieve a certain hand, such as a royal flush, to win,* but can bluff others out of the game even with a relatively mediocre hand. However, in order to win a jackpot, the player *must* obtain the hard to obtain "Sixty-four" hand at the same time another player achieves the perfect "Wheel" hand. Therefore, the slim odds of getting a "Sixty-four" and "Wheel" in the same

game, simultaneously, are indeed relevant to the determination of whether the jackpot game is primarily one based on skill or chance, just as such slim odds of winning the California Lottery are relevant to showing that a ticket lottery is a game of chance.

As Chapin stated, "the [jackpot] game is dominated by chance instead of skill, due to the tremendous odds or probabilities [for example] against one player getting a 'wheel' at the same time that another player gets a 'Sixty-Four' . . . . [J]ackpot pools continue to grow to [high] figures . . . because of the low probabilities and great element of chance that determines the winner. [J]ust as a person has a low probability and unlikely chance of winning the state 6/49 lottery, a person has a low probability and little chance of winning the jackpot."

The testimony of expert poker player Caro, and University of California, Berkeley statistics professor Aldous also highlighted just why, as a statistical matter, skilled poker players do not play for the jackpot.

At his deposition, Caro specifically testified about his statistical analysis of the seven-card stud jackpot poker game. For this analysis Caro used a computer simulation of 5,500,000 hands of 7-card stud jackpot poker played by 7 persons, all of whom stayed in each game to its completion, i.e. the showdown. Based upon his computer analysis, Caro concluded that an individual's chance of winning the jackpot in a 7-card stud poker game played by seven persons, represented the *"very best a player could hope for,"* in the game. Accordingly, Caro also acknowledged that an individual cannot "improve" his or her 1-in-23,692-or-20,307 chance of winning the jackpot (even by agreeing with other players to play for the jackpot), but must "accept those as the odds approximately . . . [as] to how many hands on average you'd have to play before you won a Jackpot . . . [if] you and all other players at the table decided that [you] wouldn't throw away a hand, no matter what."[16]

*By comparison, Caro estimated that the odds of winning the California lottery game of DECCO were similar, i.e., 1 in 28,560.*

These figures were verified by the State's expert, Aldous, a professor of statistics at the University of California, Berkeley, who is an associate editor

---

[16]It also assumes each player uses the "optimal strategy" in trying to win the jackpot, which of course, is not the case in "real" games. The "optimal strategy" in playing for the jackpot would be to discard any card which is not a two, three, four, five, or six. The "optimal strategy" in playing for a wheel would be to discard any card which is not an ace, two, three, four, or five.

of many journals including the Annals of Probability, the Journal of Mathematical Analysis, the Journal of Theoretical Probability, and the Annals of Applied Probability.[17]

Aldous also calculated how many times players would have to play the game "in order for the more skillful player to have a pretty good chance to win more times than the less skillful player." Specifically, Aldous calculated "how long" a more skillful player would have to play before such a player would have a 90 percent chance of winning more jackpots than a less skillful or "typical" player. Aldous determined that it would take a "professional gambler, who might play 60,000 hands a year (50 weeks, times 40 hours a week, times 30 hands an hour) . . . much of a lifetime [or 2,750,000 games] in order for his skill to manifest itself by winning extra jackpots."

Accordingly, this court rejects the trial court's conclusion that poker participants win the jackpot prize through skill and not by chance.

### 3. *The Prospect of Winning a Large Prize for Minor Consideration in Jackpot Poker Is Similar to the Setup of Classic Lottery Schemes*

 The jackpot game attracts players for the same reason that the "classic" lottery attracts participants. It offers the prospect of winning a large prize for minor consideration.

In general, in jackpot poker at the outset of the game, "a fixed sum" is withdrawn from the "antes" or "blinds" in each game, and this sum is placed in a separate fund known as the "jackpot." Usually, a relatively small amount, such as $1 from each game is earmarked for the jackpot.

Because chance plays such a large part in determining the jackpot award, the jackpot often accumulates over a considerable time period before it is won. For example, at the Bicycle Club, jackpot awards have run as high as $70,320. Likewise, in 1988, the Commerce Club estimated that a total of 5,374,988 hands of jackpot poker were played at the club. In 1988 a jackpot award as high as $50,000 was won. Jackpot awards at Jerry's Place have totaled as high as $25,000. Jackpot awards at the Hi Desert Casino have run as high as $10,015. Jackpot awards at the Normandie Club have run as high as $28,350. And jackpot awards at the Eldorado Club have run as high as $67,000.

---

[17]Aldous also teaches mathematical probability theory, and has authored a published article *Shuffling Cards and Stopping Times*, a 1986 study which determined the minimum number of times necessary to shuffle a deck of cards for the cards to be randomly ordered.

As Chapin testified, this type of setup with the prospect of a large chance reward for small consideration, like the "classic" lottery, "is very enticing to players and it is very popular."

Chapin further explained as follows: "[T]he jackpot award pool continues to grow until two players possess the required optimum hands (i.e., a 'wheel' and a 'Sixty-Four') and win the jackpot prize. Hence, players put up *small considerations,* such as their ante and subsequent bets, in an attempt to win a large prize. The ratio of a large award for minor consideration that is found in Jackpot Poker is significant because it is analogous to classic lottery schemes of having a remote chance to win large prizes for minimal consideration. As with lottery hysteria, as the jackpot award increases, so does the play or participation by gamblers."

Likewise, the record on appeal contains references to a Los Angeles Times newspaper story wherein George Hardie, managing partner of plaintiff Bicycle Club, also explained the lure of the jackpot games, consistent with that generally associated with lotteries: "[The jackpot game] enables a person with a very small amount of money to play some cards and win a large amount of money in relation to what he invested. . . . We all want a rainbow. . . . We all dream of making that little score, that little hit."

Accordingly, this court concludes that the jackpot feature appended to otherwise lawful poker games, offers the "classic" lottery pay-off: the chance prospect of a big money award for minor consideration.

*The Plain Language of the State's Constitution and Penal Code, as Well as Pertinent Case Law, Controvert All of Plaintiffs' Various Theories About Why California Constitution, Article IV, Section 19, and Penal Code Section 319 Should Be More Narrowly Construed*

■ In addition, assuming, *arguendo,* that the meaning of the state Constitution and statutory provisions pertaining to lotteries could somehow be subject to ambiguity, there still is no support for plaintiffs' various theories, propounded in the trial court, that the state's lottery statute was meant to be narrowly construed to apply only to ticket lotteries deemed to be a "widespread pestilence," where the winner is not present.

The courts have found that in determining whether an enterprise is a lottery it is immaterial whether a person must be present to win, or whether the lottery game is played in a set location. In *People* v. *Shira, supra,* 62 Cal.App.3d at pages 446-448, the court apparently did not find the set location of the game among active participants or the physical presence of

the lottery winner to be an impediment to finding Ringo, a game similar to bingo, to be a lottery. In Ringo the lottery winner had to be present to throw a ring over a peg. (See also *Boasberg* v. *United States* (5th Cir. 1932) 60 F.2d 185, 186 [keno game a lottery].)

Similarly, there is no support for plaintiffs' historical notions that the lotteries were condemned solely because they were regarded as a "*widespread pestilence*" and that therefore the Legislature in adopting the lottery prohibition meant to narrowly target community-wide contests, not games played in set locations. These "historical" and allegedly "logical" contentions regarding the scope of the lottery law not only lack merit, but are, in large part, immaterial.

As previously noted, the diversity of contests and games found by the California Courts to be lotteries, from "Ringo" to "5-10 pools" to theater "cash night" drawings dispels the notion that in California, the Legislature intended to prohibit only certain types of lotteries.

Moreover, California aligns itself with those Courts which have found that the "policy inherent in the [state Constitution] provision is a broad one, aimed not at specific kinds or types of lotteries operated by means of tickets, roulette wheels, or involving other particular methods of operation." (*State* v. *Brotherhood of Friends* (1952) 41 Wn.2d 133 [247 P.2d 787, 796]; see also *State* v. *Coats* (1938) 158 Ore. 122 [74 P.2d 1102, 1105, 1107]; *Secretary* v. *St. Augustine Church* (Tenn. 1989) 766 S.W.2d 499, 500-501; *Pruitt* v. *State of Indiana* (Ind.Ct.App. 1990) 557 N.E.2d 684, 690.) The Oregon court ably expresses this viewpoint compatible with California law: "There is quite a divergence of opinion among the courts of the various jurisdictions as to what constitutes a lottery. . . . Some courts take a broad view . . . that a lottery is confined to a device or scheme which has broad social consequences and amounts to what some say is a 'widespread pestilence.' No doubt this feature gave rise to prohibitory legislation against the operation of lotteries, *but, in our opinion, a scheme or device may constitute a lottery even though it does not amount to a 'widespread pestilence' . . . . It is the character of the gambling plan or scheme which determines whether it constitutes a lottery, rather than its widespread evil consequences or the number of persons who participate therein.*" (*State* v. *Coats, supra,* 74 P.2d at pp. 1105, 1107, italics added.)

As a historical matter, various state courts also have observed that in the late 1800's the "ticket lottery" was not the "only type or form of lottery which was . . . to be socially undesirable and the source of numerous evils."

(*Secretary* v. *St. Augustine Church*, *supra*, 766 S.W.2d at pp. 500-501; see also *State* v. *Brotherhood of Friends*, *supra*, 247 P.2d at p. 796.) Specifically, at that time, the courts of this country had been confronted with numerous types of lotteries involving bank nights, wheels of fortune, prizes in candy boxes, and *card games*. (See also *State* v. *Smith* (1829) 10 Tenn. 271, 281-282.)

In any event, we note that there is evidence that the jackpot games have come to be regarded as a "widespread pestilence."

Broderick, former manager of the California Department of Justice's gaming registration program, stated as follows with respect to the reasons that law enforcement finds jackpot poker undesirable: "In addition, state and local law enforcement agencies had been continually plagued with complaints surrounding the illegal skimming of such monies, the possible use of 'jackpot poker' for illegal money laundering purposes, and consumer fraud being carried out by the clubs relative to the improper distribution of these large 'jackpot poker' awards to individuals with whom they may have been in collusion. Quite candidly, inasmuch as these 'jackpot poker' awards could run into the tens of thousands of dollars, they served as an attractive item for possible abuse."

Chapin likewise explained why law enforcement is particularly concerned about jackpot games: "Law enforcement has been very concerned with the distribution of Jackpot awards because Jackpot pools are an ideal situation for 'skimming' of profits, since no outsider is privy to the exact amounts of Jackpot monies collected from the players. The California Commerce Club and the Bell Gardens Bicycle Club collect the jackpot monies and disseminate these monies in varying percentages. Clubs take approximately 15-20 percent from the 'jackpot' for so-called 'administration fees' which cover items such as costs of security, counting, cashiers and tournaments for jackpot winners. The card clubs frequently reserve a percentage of the jackpot fund as a secondary jackpot pool, or they will use collected Jackpot monies to replenish house monies that are used to start a jackpot (i.e., know[n] as the *seed*)."

Finally, it is immaterial that a number of out-of-state decisions have stated that poker is not a lottery. It is the jackpot feature which plaintiffs have affixed to the otherwise legal game which makes it an illegal lottery. Despite plaintiffs' repeated attempts to merge the jackpot feature of jackpot poker into otherwise lawful poker games, the games are as separate as oil and water.

Accordingly, the plain language of the state Constitution and Penal Code as well as the pertinent case law controvert all of plaintiffs' various theories about why California Constitution, article IV, section 19, and Penal Code section 319 should be narrowly construed.

## IV

### DISPOSITION

The judgment is reversed. Costs of appeal are awarded to appellants.

Lillie, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied August 1, 1995, and respondents' petitions for review by the Supreme Court were denied October 26, 1995. Kennard, J., was of the opinion that the petitions should be granted.